UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------x

IN RE DDAVP INDIRECT PURCHASER
ANTITRUST LITIGATION

_____

MEIJER, INC., MEIJER DISTRIBUTION, INC.,
ROCHESTER DRUG CO-OPERATIVE, INC.,
LOUISIANA WHOLESALE DRUG COMPANY,
INC., VISTA HEALTHPLAN, INC.,
PENNSYLVANIA EMPLOYEES BENEFIT TRUST          **OPINION AND ORDER**
FUND, PAINTERS DISTRICT COUNCIL NO. 30
HEALTH AND WELFARE FUND, PHILADELPHIA          No. 05-CV-2237 (CS)
FEDERATION OF TEACHERS HEALTH AND
WELFARE FUND, and HELEN SEAMON,

                    Indirect Purchaser Plaintiffs,

                    -against-

FERRING B.V., FERRING PHARMACEUTICALS,
INC., and AVENTIS PHARMACEUTICALS, INC.

                                        Defendants.
-----------------------------------------------------------------x

Appearances:

Kevin B. Love
Jason G. Andrew
Criden & Love, P.A.
South Miami, Florida

Theodore M. Lieverman
Spector Roseman Kodroff & Willis, P.C.
Philadelphia, Pennsylvania

Joseph H. Meltzer
Kessler Topaz Meltzer & Check LLP
Radnor, Pennsylvania

Patrick E. Cafferty
Cafferty & Faucher LLP

Ann Arbor, Michigan
*Co-Lead Counsel for Indirect Purchaser Plaintiffs*

Douglas L. Wald
Barbara H. Wootton
Christopher J. Flack
McCormick A. Conforti
Arnold & Porter LLP
Washington, D.C.
*Counsel for Defendants Ferring B.V. and Ferring Pharmaceuticals, Inc.*

John M. Majoras
Julie E. McEvoy
Christopher R. Farrell
Jones Day
Washington, D.C.
*Counsel for Defendant Aventis Pharmaceuticals, Inc.*

Seibel, J.

Before the Court is the motion of Defendants Ferring B.V., Ferring Pharmaceuticals, Inc., and Aventis Pharmaceuticals, Inc., (Doc. 103), seeking dismissal of the Amended Consolidated Class Action Complaint (the "Complaint" or "Compl."), (Doc. 84), of putative representatives of a nationwide Indirect Purchaser Plaintiff class ("Plaintiffs" or "Indirect Purchaser Plaintiffs"), under Federal Rules of Civil Procedure 12(b)(1) for lack of standing and 12(b)(6) for failure to state a claim, and Plaintiffs' Request for Judicial Notice, (Doc. 109). For the following reasons, Defendants' Motion to Dismiss is GRANTED IN PART and DENIED IN PART, and Plaintiffs' Request for Judicial Notice is DENIED.

## I.    BACKGROUND AND PROCEDURAL HISTORY

The facts (but not the conclusions) in the Complaint are assumed to be true for the purposes of this Opinion. Plaintiffs' claims arise from the manufacture and marketing of DDAVP, an antidiuretic, and its generic equivalents, called desmopressin acetate. (Compl. ¶ 1.) Ferring B.V. is a privately held company organized under the laws of the Netherlands, and Ferring Pharmaceuticals, Inc. is a New York corporation and a subsidiary of Ferring B.V. (collectively "Ferring") that developed and manufactured DDAVP. (*Id.* ¶¶ 17-18.) Ferring is the owner of U.S. Patent No. 5,407,398 (the "'398 patent") that the Patent and Trademark Office (the "PTO") issued on September 10, 1991, covering a gastrointestinally-absorbable tablet form of DDAVP. (*Id.* ¶¶ 54, 69.) Previously, Ferring was the owner of two other patents related to DDAVP that had expired, and the inventions claimed therein had entered the public domain. (*Id.* ¶¶ 50, 51, 54.) Aventis Pharmaceuticals, Inc. ("Aventis") is a Delaware corporation to which Ferring licensed the exclusive right to market and sell the invention of the '398 patent in the United States. (*Id.* ¶ 19.)

3

After the '398 patent issued, Defendants filed a new drug application (an "NDA") with the United States Food and Drug Administration (the "FDA"), and the FDA listed the '398 patent in its publication "Approved Drug Products with Therapeutic Equivalence Evaluations," commonly known as the "*Orange Book*," (*id.* ¶¶ 34, 77), which provides notice concerning patents covering FDA-approved drugs, (*id.* ¶ 34). When a generic drug manufacturer seeks to produce a generic version of a drug, it may submit an abbreviated new drug application (an "ANDA") to the FDA to obtain such approval. (*Id.* ¶ 39.) If a patent is listed in the *Orange Book* and a generic drug manufacturer believes that the patent is invalid or will not be infringed by the proposed generic drug, it must provide a "Paragraph IV certification" in connection with any ANDA that it files with the FDA. (*Id.* ¶ 41.) The filing of a Paragraph IV certification is considered a technical act of patent infringement under 35 U.S.C. § 271(e)(2) upon which the branded drug manufacturer may institute a patent infringement lawsuit. (*Id.* ¶ 43.) The filing of such a lawsuit in turn invokes a thirty-month stay of approval of the generic manufacturer's pending ANDA, thereby blocking entry of the generic competitor into the market. (*Id.* ¶¶ 43, 45.)

In this case, Barr Laboratories ("Barr") submitted ANDA No. 76-470 to obtain approval from the FDA to manufacture and sell a generic version of the tablet form DDAVP. (*Id.* ¶ 83.) The ANDA contained a Paragraph IV certification in which Barr claimed that '398 patent was invalid because Ferring had committed inequitable conduct before the PTO (discussed below). (*Id.*) On December 13, 2002, in response to Barr's Paragraph IV certification, Defendants filed a patent infringement suit in the Southern District of New York against Barr, and Barr was therefore stayed from entering the market for thirty months. (*Id.* ¶ 85.) Similarly, on or about June 9, 2004, Teva Pharmaceuticals USA, Inc. ("Teva") submitted a separate ANDA to sell a

4

generic version of DDAVP, which included a Paragraph IV certification. (*Id.* ¶¶ 98-99.) On

June 20, 2004, Defendants filed a patent infringement lawsuit against Teva in the District of

Delaware, which also subjected Teva to the thirty-month stay. (*Id.* ¶¶ 100-01.)

The inequitable conduct to which Barr's and Teva's Paragraph IV certifications referred

related to the following facts. The PTO had twice rejected Ferring's application for the '398

patent on grounds that the '398 patent would be obvious in light of Ferring's prior DDAVP

patents, (*id.* ¶¶ 58-64), which rejection was affirmed by the Board of Patent Appeals, (*id.* ¶¶ 65-

66). Ferring responded by filing an amendment after appeal, which it supported by five

declarations that purported to be from "non-inventors," each of whom affirmed to the PTO that

the prior DDAVP patents did not teach the art in the '398 patent and thus render the '398 patent

obvious. (*Id.* ¶¶ 67-68.) In other words, Ferring submitted declarations from people purportedly

unaffiliated with Ferring to the effect that the prior DDAVP patents did not make the '398 patent

obvious and thus unworthy of patent protection. After the amendment addressing the PTO's

concern regarding prior art, as to which the PTO had specifically asked for "non-inventor"

evidence, (*id.* ¶ 60), the PTO issued the '398 patent. (*Id.* ¶ 69.) Unbeknownst to the PTO,

however, three of the declarations were submitted by paid consultants of Ferring who failed to

disclose their relationship with the company, despite the PTO's request for objective, non-

inventor testimony. (*See id.* ¶¶ 60, 70-76, 86.)

On February 7, 2005, the district court in Defendants' infringement suit against Barr

granted summary judgment to Barr, and found the '398 patent unenforceable. (*Id.* ¶ 87.) The

district court determined that Ferring had deceived the PTO by submitting declarations to the

PTO that purported to be made by "non-inventors," when in fact the declarants had "close and

undisclosed long-standing associations" with Ferring, and that without the declarations, the '398

patent would not have issued. (*Id.* ¶¶ 87, 89); *see Ferring B.V. v. Barr Labs., Inc*, No. 02-CV-9851, 2005 WL 437981, at *9-10 (S.D.N.Y. Feb. 7, 2005). The United States Court of Appeals for the Federal Circuit affirmed the district court's decision on the patent's unenforceability, finding ample evidence of Ferring's intent to deceive the PTO. (Compl. ¶¶ 90-93); *see Ferring B.V. v. Barr Labs., Inc.*, 437 F.3d 1181 (Fed. Cir. 2006).

On February 2, 2004, during the time that Defendants were prosecuting their infringement claim against Barr, Ferring filed a citizen petition with the FDA, asking the FDA to mandate that all ANDAs seeking approval to market a generic version of DDAVP include more stringent evidentiary proofs of bioequivalence, including comparative clinical end-point studies in children and separate evidence of bioequivalence for each dose level. (Compl. ¶¶ 102, 104.) On July 1, 2005, the FDA denied Ferring's citizen petition, concluding that Ferring had not proffered evidence as to why the FDA should depart from its well-established methodologies to establish bioequivalence, and further determining that, in violation of 21 C.F.R. § 10.30 (requiring petitioner to certify that "petition includes all information and views on which the petition relies, and that it includes representative data and information known to the petitioner which are unfavorable to the petition"), Ferring had failed to cite an Aventis study that was inconsistent with the position advanced by Ferring in the citizen petition. (*Id.* ¶ 115.) On the same day, the FDA granted final approval of Barr's ANDA for generic DDAVP tablets, and Barr launched its generic DDAVP product on July 15, 2005. (*Id.* ¶¶ 117-18.) As the first generic competitor to file a Paragraph IV certification, Barr had the exclusive right to market generic DDAVP for 180 days. (*Id.* ¶¶ 46, 118.) Teva entered the market after the FDA approved its ANDA on January 25, 2006. (*Id.* ¶ 119.)

Meijer, Inc. and Meijer Distribution, Inc. filed a class action complaint in this case on February 18, 2005. (Doc. 1.) Subsequently, two classes of plaintiffs – the Direct Purchaser Plaintiff class (the "Direct Purchaser Plaintiffs") and the Indirect Purchaser Plaintiffs (collectively the "Plaintiff classes") – filed consolidated class action complaints on April 5, 2006. (Docs. 28, 29.) Defendants filed a joint motion to dismiss the claims of both Plaintiff classes on May 1, 2006, (*see* Doc. 32), and Aventis separately moved to dismiss the complaints against it for failure to plead fraud with particularity, (*see* Doc. 35), (collectively, the "first motions to dismiss"). Judge Charles Brieant, to whom the case was then assigned, granted the first motions to dismiss, holding that (1) Plaintiffs did not have standing to bring antitrust claims, (2) Ferring's citizen petition was protected by the First Amendment, and (3) Plaintiffs had failed to plead fraud with particularity against Aventis with respect to its knowledge of Ferring's inequitable conduct before the PTO. (*See* Docs. 48, 50.) Both Plaintiff classes appealed to the Second Circuit. (Doc. 54.)

The Second Circuit determined – only with respect to the Direct Purchaser Plaintiffs – that they (1) had standing to raise antitrust claims against Defendants; (2) plausibly alleged antitrust claims based on *Walker Process* fraud (discussed below), sham litigation, the fraudulent listing of the '398 patent in the *Orange Book*, and a baseless citizen petition; and (3) had pleaded the circumstances of Aventis's alleged fraud with particularity. *See In re DDAVP Direct Purchaser Antitrust Litig.*, 585 F.3d 677, 687-95 (2d Cir. 2009). After the case was remanded back to this Court,[1] Defendants and the Direct Purchaser Plaintiffs settled their claims, a settlement on which I held a fairness hearing and which I approved orally on November 2, 2011, (*see* Doc. 115), as memorialized in a November 28, 2011 Order, (*see* Doc. 113).

---

[1] The case was reassigned to me after Judge Brieant passed away. (Doc. 72.)

On March 31, 2011, the Second Circuit granted the motion of the parties in the instant

litigation to remand the case to this Court for a "determination of whether the amended judgment

should be vacated as to the Indirect Purchaser Plaintiffs, in light of [the Second Circuit's]

decision in *In re DDAVP Direct Purchaser Antitrust Litigation . . . .*" (Doc. 73 at 2.) On July 6,

2011, I vacated the amended judgment. (Doc. 79.) The Indirect Purchaser Plaintiffs[2] filed the

Complaint on July 26, 2011 seeking injunctive relief under Section 16 of the Clayton Act for

Defendants' alleged violations of Section 2 of the Sherman Act; compensatory and multiple

damages under the antitrust and/or consumer protection statutes of the Indirect Purchaser

Plaintiffs' states;[3] and restitution, disgorgement, and constructive trust for unjust enrichment

under the laws of all fifty states and the District of Columbia. (*See* Compl. ¶¶ 133-49.)

Defendants now jointly move to dismiss the Complaint for failure to state a claim. (Doc. 103.)

## II.   LEGAL STANDARDS

### A.   Motion to Dismiss

"To survive a motion to dismiss, a complaint must contain sufficient factual matter,

accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556

U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim

has facial plausibility when the plaintiff pleads factual content that allows the court to draw the

reasonable inference that the defendant is liable for the misconduct alleged." *Id.* "While a

complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual

allegations, a plaintiff's obligation to provide the grounds of his entitlement to relief requires

---

[2] Plaintiffs are various health benefits providers who allegedly paid supra-competitive prices for DDAVP or its generic equivalents as a result of Defendants alleged conduct, as well as an individual who also allegedly paid too much for the same drug. (Compl. ¶¶ 11-16.)

[3] These twenty-eight jurisdictions are:  Arizona, Arkansas, California, Colorado, the District of Columbia, Florida, Hawaii, Idaho, Iowa, Kansas, Maine, Massachusetts, Michigan, Minnesota, Mississippi, Nebraska, Nevada, New Hampshire, New Mexico, New York, North Carolina, North Dakota, South Dakota, Tennessee, Utah, Vermont, West Virginia, and Wisconsin. (*Id.* ¶ 140.)

more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555 (alteration, citations, and internal quotation marks omitted). While Federal Rule of Civil Procedure 8 "marks a notable and generous departure from the hyper-technical, code-pleading regime of a prior era, . . . it does not unlock the doors of discovery for a plaintiff armed with nothing more than conclusions." *Iqbal*, 556 U.S. at 678-79.

In considering whether a complaint states a claim upon which relief can be granted, the court "begin[s] by identifying pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth," and then determines whether the remaining well-pleaded factual allegations, accepted as true, "plausibly give rise to an entitlement to relief." *Id.* at 679. Deciding whether a complaint states a plausible claim for relief is "a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id.* "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged – but it has not 'shown' – 'that the pleader is entitled to relief.'" *Id.* (alteration omitted) (quoting Fed. R. Civ. P. 8(a)(2)).

**B.**    **Consideration of Documents Outside the Pleadings**

When deciding a motion to dismiss, the Court is entitled to consider the following:

> (1) facts alleged in the complaint and documents attached to it or incorporated in it by reference, (2) documents integral to the complaint and relied upon in it, even if not attached or incorporated by reference, (3) documents or information contained in [a] defendant's motion papers if plaintiff has knowledge or possession of the material and relied on it in framing the complaint, (4) public disclosure documents required by law to be, and that have been, filed with the Securities and Exchange Commission, and (5) facts of which judicial notice may properly be taken under Rule 201 of the Federal Rules of Evidence.

*Weiss v. Inc. Vill. of Sag Harbor*, 762 F. Supp. 2d 560, 567 (E.D.N.Y. 2011) (internal quotation marks omitted); *accord Chambers v. Time Warner, Inc.*, 282 F.3d 147, 152-53 (2d Cir. 2002).

"Rule 201 of the Federal Rules of Evidence permits judicial notice of a fact that is 'either (1) generally known within the territorial jurisdiction of the trial court or (2) capable of accurate and ready determination by resort to sources whose accuracy cannot be reasonably . . . questioned.'" *United States v. Bryant*, 402 F. App'x 543, 545 (2d Cir. 2010) (summary order) (quoting Fed. R. Evid. 201).  Further, it is well established that courts may take judicial notice of publicly available documents on a motion to dismiss.  *See Byrd v. City of N.Y.*, No. 04-CV-1396, 2005 WL 1349876, at *1 (2d Cir. June 8, 2005) (summary order) ("[M]aterial that is a matter of public record may be considered in a motion to dismiss."); *Blue Tree Hotels Inv. (Can.), Ltd. v. Starwood Hotels & Resorts Worldwide, Inc.*, 369 F.3d 212, 217 (2d Cir. 2004) (courts can "look to public records, including complaints filed in . . . court, in deciding a motion to dismiss").  But, "[i]n the motion to dismiss context, . . . a court should generally take judicial notice 'to determine what statements [the documents] contain[ ] . . . not for the truth of the matters asserted.'" *Schubert v. City of Rye*, 775 F. Supp. 2d 689, 698 (S.D.N.Y. 2011) (alterations in original) (quoting *Kramer v. Time Warner Inc.*, 937 F.2d 767, 774 (2d Cir. 1991)); *see Global Network Commc'ns, Inc. v. City of N.Y.*, 458 F.3d 150, 157 (2d Cir. 2006) ("A court may take judicial notice of a document filed in another court not for the truth of the matters asserted in the other litigation, but rather to establish the fact of such litigation and related filings.") (internal quotation marks omitted).

### C.    **Leave to Amend**

Leave to amend a complaint should be freely given when justice so requires.  Fed. R. Civ. P. 15(a)(2).  It is within the sound discretion of the district court to grant or deny leave to amend. *McCarthy v. Dun & Bradstreet Corp.*, 482 F.3d 184, 200 (2d Cir. 2007).  "Leave to amend, though liberally granted, may properly be denied for: 'undue delay, bad faith or dilatory motive

on the part of the movant, repeated failure to cure deficiencies by amendments previously

allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, futility

of amendment, etc.'" *Ruotolo v. City of N.Y.*, 514 F.3d 184, 191 (2d Cir. 2008) (quoting *Foman*

*v. Davis*, 371 U.S. 178, 182 (1962)).  Where the "problem with [a complaint] is substantive [and]

better pleading will not cure it," leave to amend should be denied as futile.  *Cuoco v. Moritsugu*,

222 F.3d 99, 112 (2d Cir. 2000); *see Malester v. Adamo*, No. 09-CV-9374, 2010 WL 5065865, at

*4 (S.D.N.Y. Dec. 8, 2010) ("A motion for leave to amend should be denied when allowing such

an amendment would be futile in that it could not withstand a motion to dismiss for failure to

state a claim.").

## III.   DISCUSSION

###   A.   Injunction under Section 16 of the Clayton Act for Defendants' Violations of Section 2 of the Sherman Act

####    1.   Claim

Under the Clayton Act, "[a]ny person, firm, corporation, or association shall be entitled

to sue for and have injunctive relief, in any court of the United States having jurisdiction over the

parties, against threatened loss or damage by a violation of the antitrust laws."  15 U.S.C. § 26.

In other words, plaintiffs "must demonstrate a significant threat of injury from an impending

violation . . . or from a contemporary violation likely to continue or recur."  *In re New Motor*

*Vehicles Canadian Exp. Antitrust Litig.*, 522 F.3d 6, 13 (1st Cir. 2008) (internal quotation marks

omitted); *see Chance v. Bd. of Exam'rs*, 561 F.2d 1079, 1092 n.25 (2d Cir. 1977) (injunction "'is

justified only by the [wrongdoing] that induced it and only so long as it counteracts a continuing

[violation]'") (alterations in original) (quoting *Milk Wagon Drivers Union of Chi., Local 753 v.*

*Meadowmoor Dairies*, Inc., 312 U.S. 287, 298-99 (1941)).  But "[i]n the context of injunctive

relief, . . . lingering monetary injury, without any ongoing threat of recurrent violations [to the

plaintiffs], is not sufficient to confer standing to seek an injunction." *In re Nifedipine Antitrust Litig.*, 335 F. Supp. 2d 6, 19 (D.D.C. 2004); *compare Zenith Radio Corp. v. Hazeltine Research, Inc.*, 395 U.S. 100, 131-32 (1969) (finding injunction could properly issue where allegations demonstrated that plaintiff patentee, which was associated with Canadian patent pool, sought to exclude defendant licensee from Canadian market, and there was nothing to indicate that conduct had terminated or would cease in foreseeable future), *with In re G-Fees Antitrust Litig.*, 584 F. Supp. 2d 26, 35 (D.D.C. 2008) (dismissing claim for injunction where plaintiffs failed to show that defendants threatened to injure plaintiffs' business or property and "[a]n order enjoining defendants from specific future conduct would have no remedial effect whatsoever on the continuing future damages plaintiffs expect to experience due to the past injury").

Defendants argue that the Plaintiffs are not entitled to an injunction because the '398 patent has been held to be unenforceable, and thus there is no threat of future injury to Plaintiffs. (*See* Ds' Mem. 4-6; Ds' Reply Mem. 1-2.)[4] Plaintiffs concede that there is no threat of future injury from enforcement of the '398 patent but argue that they seek an injunction "to assure that similar anticompetitive conduct does not occur in the future whether related to DDAVP or any other drug [for which] Plaintiffs may be forced to pay supracompetitive prices down the road." (Ps' Mem. 23 (internal quotation marks omitted).)[5]

Plaintiffs have not pleaded facts to show that they are entitled to an injunction. Plaintiffs allege vaguely that they seek injunctive relief "to remedy the anti-competitive market effects caused by the unlawful conduct of Defendants, and other relief so as to assure that similar anti-

---

[4] "Ds' Mem." refers to the Memorandum of Points and Authorities in Support of Defendants' Joint Motion to Dismiss the Indirect Purchaser Plaintiffs' Amended Consolidated Class Action Complaint. (Doc. 104.) "Ds' Reply Mem." refers to the Reply Memorandum of Points and Authorities in Support of Defendants' Joint Motion to Dismiss the Indirect Purchaser Plaintiffs' Amended Consolidated Class Action Complaint. (Doc. 106.)
[5] "Ps' Mem." refers to the Indirect Purchaser Plaintiffs' Memorandum of Law in Opposition to Defendants' Joint Motion to Dismiss Indirect Purchaser Plaintiffs' Amended Consolidated Class Action Complaint. (Doc. 107.)

competitive conduct does not occur in the future," (Compl. ¶ 138), but fail to allege how any

putative Plaintiff faces a significant threat of injury from an impending violation relating to the

'389 patent or supra-competitive prices of DDAVP.  Further, with respect to "other drugs,"

Plaintiffs have similarly failed to demonstrate which drugs might be involved, or what fraudulent

conduct might be undertaken, or which Plaintiffs might buy the drugs at supra-competitive

prices.  In other words, Plaintiffs' claim of future injury is wholly speculative.  Putative class

claims for an injunction fail where they do not demonstrate a threat of future injury to the

plaintiffs in the case.  *See, e.g.*, *New Motor Vehicles*, 522 F.3d at 14 ("Plaintiffs have failed to

establish the continuing presence of the requisite threatened injury.  The 'perfect storm' that

allegedly precipitated massive arbitrage opportunities for selling Canadian cars in the United

States ceased long ago."); *In re Plavix Indirect Purchaser Antitrust Litig.*, No. 06-CV-226, 2011

WL 335034, at *4 (S.D. Ohio Jan. 31, 2011) (considering defendants' past unlawful conduct, but

determining that "[p]laintiffs simply have not established that there remains any threatened

conduct that will cause loss or damage [to them] as [is] necessary to seek injunctive relief")

(internal quotation marks omitted); *G-Fees*, 584 F. Supp. 2d at 35 (plaintiffs failed to identify

future conduct by defendants that threatened plaintiffs' property or business; "Plaintiffs have

conflated damages from a past injury that will be realized in the future . . . with the threat of a

future injury.  Plaintiffs seek injunctive relief to prevent defendants from colluding with regard

to G-Fees and requiring of lenders that G-Fees be kept secret and confidential.  However, even if

this alleged collusion were to be enjoined, plaintiffs would not feel relief because none claims to

be a future mortgagee, and as current mortgagees, the G-Fees are already 'baked in' to their

mortgages . . . .") (internal citation and quotation marks omitted);.  Because Plaintiffs have failed

to "demonstrate a significant threat of injury from an impending violation . . . or from a

contemporary violation likely to continue or recur," *New Motor Vehicles*, 522 F.3d at 13 (internal quotation marks omitted), Plaintiffs have not plausibly stated a claim for an injunction under Section 16 of the Clayton Act.

### 2.    Request for Judicial Notice and Leave to Amend

In connection with their argument that a threat of future injury exists, Plaintiffs request that I take judicial notice of court filings in five other lawsuits involving Ferring and Aventis. (*See generally* Ps' Req. for Judicial Notice.)[6]  Plaintiffs argue that "Defendants have shown a certain proclivity for unlawful conduct when it comes to maintaining their drug monopolies," (Ps' Mem. 23; *see id.* at 23-26), and "ask the Court to simply take judicial notice that such allegations *exist* and that Plaintiffs intend to prove these allegations *in this case* in order to obtain an injunction against the Defendants to prove 'future violations,'" (Ps' Req. for Judicial Notice ¶ 4 (emphasis in original)).  Plaintiffs further argue that because Defendants did not seek to dismiss the Clayton Act claims in their first motions to dismiss, Plaintiffs did not realize that they had to include in their Complaint the allegations set forth in their Request for Judicial Notice. (*Id.* ¶ 3.) Plaintiffs alternatively seek leave to amend the Complaint to add these allegations if the Court chooses not to take judicial notice.  (*Id.*) Defendants oppose Plaintiffs' Request for Judicial Notice as an improperly-captioned request for leave to amend the Complaint and as inappropriate on a motion to dismiss because the Court would have to assume the truth of the allegations in the various lawsuits in connection with the instant Motion to keep Plaintiffs' claims alive. (*See generally* Ds' Opp.)[7]

It appears that Plaintiffs are asking this Court to look to facts alleged within documents filed in other court cases "not to establish their existence, but rather to provide the reasoned basis

---

[6] "Ps' Req. for Judicial Notice" refers to Plaintiffs' Request for Judicial Notice in Support of their Memorandum of Law in Opposition to Defendants' Joint Motion to Dismiss. (Doc. 109.)

[7] "Ds' Opp." refers to Defendants' Opposition to Plaintiffs' Request for Judicial Notice. (Doc. 105.)

for the court's conclusion," *Global Network Commc'ns*, 458 F.3d at 157 – that is, Plaintiffs want

the Court to consider not just that Defendants have been accused, but that Defendants in fact

have an alleged proclivity for engaging in inequitable conduct before the PTO. Judicial notice of

these facts is not permitted under Federal Rule of Evidence 201. *See id.* (on motion to dismiss,

court may take judicial notice of the existence of public records, but not the truth of facts

contained therein). Even if this Court were to take judicial notice of these filings, that

Defendants may have been charged with engaging, or may have engaged, in inequitable conduct

in other cases is no basis for letting Plaintiffs pursue their claim for an injunction in this case for

the reasons already stated. Despite Defendants' past unlawful conduct in this case (and possibly

other cases), "Plaintiffs simply have not established that there remains any threatened conduct

that will cause loss or damage [to them] as [is] necessary to seek injunctive relief." *Plavix*, 2011

WL 335034, at *4 (internal quotation marks omitted).

Further, I deny Plaintiffs' request for leave to amend the Complaint to add allegations

contained in their Request for Judicial Notice concerning Defendants' conduct in these five

cases. Although a court should grant leave to amend when justice so requires, *see* Fed. R. Civ. P.

15(a)(2), I find that it would be futile to do so under these facts, *see Ruotolo*, 514 F.3d at 191

(leave to amend may be denied if amendment is futile). Amending the Complaint to add

allegations concerning Defendants' conduct regarding drugs other than the one in the instant

case, and which conduct (even if true) would not render any less speculative Plaintiffs' claim of

future injury from conduct relating to yet other drugs, would not cure the deficiencies in

Plaintiffs' pleading of their claim for an injunction under Section 16 of the Clayton Act. *See*

*MacEntee v. Int'l Bus. Mach.*, 783 F. Supp. 2d 434, 446 (S.D.N.Y. 2011) (repleading futile

where problem with claim is substantive and additional allegations will not cure it); *Lee v. Regal*

*Cruises, Ltd.*, 916 F. Supp. 300, 304 (S.D.N.Y. 1996) (denying leave to amend proper where "proposed amendment would be futile, as the factors upon which plaintiffs now would rely would be insufficient to salvage their case even if leave to amend were granted").  As discussed earlier in connection with Plaintiff's Request for Judicial Notice, that Defendants on other occasions may have unlawfully sought to obtain or protect patents (which the Court would have to assume to be true if such allegations were in the Complaint) does not plausibly demonstrate "a significant threat of injury  . . . from a contemporary violation likely to continue or recur." *Hazeltine Research*, 395 U.S. at 130.  The "contemporary violation" here relates to DDAVP and has ceased without chance of recurrence.  That the same Defendants might have engaged in unrelated unlawful conduct does not warrant injunctive relief for conduct that will not recur.  *See United States v. W. T. Grant Co.*, 345 U.S. 629, 633 (1953) ("The necessary determination is that there exists some cognizable danger of recurrent violation, something more than the mere possibility which serves to keep the case alive."); *United States v. Or. State Med. Soc'y*, 343 U.S. 326, 333-34 (1952) ("The sole function of an action for injunction is to forestall future violations. . . . The record discloses no threat or probability of resumption of the [challenged actions].  We agree with the trial court that conduct discontinued in 1941 does not warrant the issuance of an injunction in 1949."); *Chance*, 561 F.2d at 1092 n.25 (injunction is justified only to counteract a continuing violation).

Because Plaintiffs have failed to set forth facts plausibly suggesting a significant threat of injury, and have not suggested that they are in possession of facts that could cure those pleading deficiencies, Defendants' Motion to Dismiss Plaintiffs' claim for an injunction under Section 16 of the Clayton Act is granted, and Plaintiffs' requests for judicial notice and, alternatively, leave to amend the Complaint are denied.

**B.**     **State-Law Claims**

Next, Defendants make various arguments concerning why the Court should dismiss Plaintiffs' state-law claims. Defendants claim that (1) Plaintiffs lack standing to assert state-law claims under the laws of jurisdictions other than Florida, Illinois, and Pennsylvania, the states in which the putative class representatives reside, (Ds' Mem. 13-16; Ds' Reply Mem. 6-7); (2) Plaintiffs' state-law claims are preempted by federal patent or FDA law, (Ds' Mem. 6-13; Ds' Reply Mem. 2-6); and (3) even if the Court finds that Plaintiffs have standing and that their claims are not preempted, the state-law claims fail for various other reasons, (Ds' Mem. 16-25; Ds' Reply Mem. 8-10). I address each argument in turn.

**1.**     **Article III Standing of Named Plaintiffs**

The named plaintiffs in this action are residents of Florida, Pennsylvania, and Illinois, respectively. (*See* Compl. ¶¶ 11-14.) Defendants argue that the named plaintiffs lack Article III standing to assert claims under the laws of states in which they do not reside or did not suffer injury, and that they cannot acquire standing through the back door of a class action lawsuit. (*See* Ds' Mem. 13-16; Ds' Reply Mem. 6-7.) Plaintiffs argue that the issue of whether the named plaintiffs can raise claims on behalf of other class members is a class certification issue, and that when class certification is the source of potential standing problems, a court should make the class certification determination before deciding the standing issue. (*See* Ps' Mem. 26-29.)

Generally, an Article III court must determine that it has jurisdiction over a plaintiff at the outset of a case. *See Cent. States Se. & Sw. Areas Health & Welfare Fund v. Merck-Medco Managed Care, L.L.C.*, 433 F.3d 181, 197-98 (2d Cir. 2005). But the Supreme Court has carved out an exception to that rule when class certification issues are "'logically antecedent' to Article

III concerns." *Ortiz v. Fibreboard Corp.*, 527 U.S. 815, 831 (1999) (quoting *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 612 (1997)). Although the Second Circuit has not yet defined the contours of the "logically antecedent" exception, "'there has been a growing consensus among district courts that class certification is 'logically antecedent,' where its outcome will affect the Article III standing determination, and the weight of authority holds that in general class certification should come first.'" *Winfield v. Citibank, N.A.*, 842 F. Supp. 2d 560, 574 (S.D.N.Y. 2012) (quoting *Blessing v. Sirius XM Radio Inc.*, 756 F. Supp. 2d 445, 451 (S.D.N.Y. 2010)); *see In re Grand Theft Auto Video Game Consumer Litig. (No. II)*, No. 06-MD-1739, 2006 WL 3039993, at *2 (S.D.N.Y. Oct. 25, 2006) (acknowledging split of authority on issue, but holding that "the better interpretation is to treat class certification as logically antecedent to standing where class certification is the source of the potential standing problems").

I join the courts in that growing consensus and find that class certification is logically antecedent to the issue of standing in this case. Defendants do not dispute that the named plaintiffs have standing to bring claims against Defendants under the state antitrust and consumer protection laws of Florida, Pennsylvania, and Illinois, the states in which Plaintiffs reside and purchased DDAVP. Thus, "this is not a case where the Named Plaintiffs are attempting to piggy-back on the injuries of the unnamed class members. Rather, each of the Named Plaintiffs asserts a[n] . . . injury resulting from Defendants' allegedly wrongful" conduct, *Grand Theft Auto*, 2006 WL 3039993, at *3 (citation and internal quotation marks omitted), and a favorable court decision will redress the named plaintiffs' injuries, *see Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 180-81 (2000) (plaintiff must demonstrate (1) injury in fact, (2) fairly traceable to defendant's alleged wrongful conduct, (3) that may be redressed by a favorable decision). Therefore, the issue "is not whether the Named Plaintiffs

have standing to sue Defendants – they most certainly do – but whether their injuries are

sufficiently similar to those of the purported Class to justify the prosecution of a nationwide class

action," which is properly determined at the class certification stage, when this Court may

consider commonality and typicality issues with respect to the named plaintiffs and other

putative class members. *In re Grand Theft Auto*, 2006 WL 3039993, at *3; *see In re Digital

Music Antitrust Litig.*, 812 F. Supp. 2d 390, 406 (S.D.N.Y. 2011) (finding that named plaintiffs'

claims related to conduct "alleged to be the same no matter where any plaintiff resides," and

deferring determination on standing until after class certification); *Blessing*, 756 F. Supp. 2d at

452 (same); *In re Buspirone Patent Litig.*, 185 F. Supp. 2d 363, 377 (S.D.N.Y. 2002) (same).

Defendants' Motion to Dismiss Plaintiffs' state-law claims for lack of standing is therefore

denied.

### 2.    Preemption of Plaintiffs' State-Law Antitrust and/or Consumer Protection Claims

In the Direct Purchaser Plaintiffs' appeal in this case, the Second Circuit held that that

class of plaintiffs had sufficiently alleged federal antitrust claims of the kind articulated in

*Walker Process Equipment, Inc. v. Food Machinery & Chemical Corp.*, 382 U.S. 172 (1965),[8] to

survive the first motions to dismiss. *See DDAVP Direct Purchaser Antitrust Litig.*, 585 F.3d at

693-94. Further, they had plausibly alleged that that the citizen petition filed by Ferring caused

delay in generic competition, demonstrated by the fact that the FDA approved the generic

DDAVP drug on the same day that it rejected Ferring's citizen petition. *Id.* at 694. An issue that

---

[8] In *Walker Process*, the Supreme Court held that a plaintiff could raise a Sherman Act claim – a federal antitrust cause of action – based on an assertion that a patent was obtained by fraud on the PTO, as long as the plaintiff could plead all the elements of a Sherman Act claim. 382 U.S. at 177-78. The fraud stripped the patentee of the antitrust immunity it would otherwise enjoy. *Id.* at 177. Here, Plaintiffs assert their antitrust and consumer protection claims under state law, but have not pointed to any state law explicitly recognizing an antitrust or consumer protection law claim based on the assertion that a patent was obtained by fraud. Therefore, as in *In re Ciprofloxacin Hydrochloride Antitrust Litigation*, 363 F. Supp. 2d 514, 517 n.3 (E.D.N.Y. 2005), this Court will refer to Plaintiffs' claims as state-law *Walker Process*-type claims.

19

was not determined in the first motions to dismiss is whether the Indirect Purchaser Plaintiffs'

state-law *Walker Process* type-claims are preempted.

Defendants argue that Plaintiffs' state antitrust and/or consumer protection law claims are

preempted by federal law because these claims are either based on misconduct before the PTO,

which is preempted by federal patent law, or concern the "baseless citizen petition," which is

preempted by federal FDA law. (*See* Ds' Mem. 6-13; Ds' Reply Mem. 2-6.) Plaintiffs argue

that their state-law *Walker Process*-type antitrust claims should not be preempted because such

state-law claims do not stand as obstacles to the federal laws' purposes and objectives. (*See* Ps'

Mem. 5-17.) Further, Plaintiffs argue that a claim predicated on a sham citizen petition "is an

antitrust claim just as a *Walker Process* claim is an antitrust claim," (*id.* at 18), and thus should

not be preempted. (*See id.* at 17-22.)

### a. __Conduct before the PTO__

It appears that neither the Supreme Court nor an appellate court has analyzed the question

of whether a plaintiff may bring state-law *Walker Process*-type antitrust claims predicated on

fraudulent conduct before the PTO.

In *Walker Process*, the Supreme Court held that as long as a plaintiff could plead the

intent and conduct elements of a Sherman Act violation, *see* 15 U.S.C. § 2, as well as that the

defendant's conduct had the ability to reduce or destroy competition, that plaintiff could pursue a

federal antitrust claim predicated on a defendant's maintenance and enforcement of a patent

procured by knowing and willful fraud before the PTO. 382 U.S. at 177-78; *see id.* at 177 ("to

strip [a patentee] of its exemption from the antitrust laws," an antitrust plaintiff is required to

prove that patentee "obtained the patent by knowingly and willfully misrepresenting facts to the

[PTO]"). Justice Harlan's concurrence emphasized that the Court's holding did not extend to

20

any invalid patent, but only to one "procured by deliberate fraud." *Id.* at 180 (Harlan, J., concurring).

In *Abbott Laboratories v. Brennan*, 952 F.2d 1346 (Fed. Cir. 1991), the Federal Circuit narrowly held that a state tort action for abuse of process could not be used to "collateral[ly] review" inequitable conduct before the PTO because it "would be an inappropriate collateral intrusion on the regulatory procedures of the PTO . . . and is contrary to Congress' preemptive regulation in the area of patent law," unless the plaintiff can show "that the entire federal agency action was a sham." *Id.* at 1356-57; *see Semiconductor Energy Lab. Co. v. Samsung Elecs. Co.*, 204 F.3d 1368, 1380-83 (Fed. Cir. 2000) (finding New Jersey RICO counterclaim preempted because if acts of "inequitable conduct, without more, could be considered predicate acts under . . . state RICO law, then every accused infringer asserting an inequitable conduct defense would also bring such a RICO counterclaim"); *see also Sign-A-Way, Inc. v. Mechtronics Corp.*, No. 98-CV-1491, 2000 WL 353151, at *4-5 (Fed. Cir. Apr. 5, 2000) (unpublished disposition) (citing *Abbott Laboratories* and *Semiconductor Energy* in holding that state-law claim for breach of duty of candor and good faith based on inequitable conduct before PTO is preempted by federal patent law).

Building off *Abbott Laboratories*, the Federal Circuit held in *Dow Chemical Co. v. Exxon Corp.*, 139 F.3d 1470 (Fed. Cir. 1998), that a plaintiff may plead both state-law and patent-law claims based in part on the same conduct when the claims "address entirely different wrongs and also provide different forms of relief," *id.* at 1478, and the state law cause of action "is not an impermissible attempt to offer patent-like protection to subject matter addressed by federal law," *id.* at 1473. In *Abbott Laboratories*, the conduct attacked by the abuse-of-process claim occurred entirely before the PTO, *see* 952 F.2d at 1355, but in *Dow* conduct before the PTO was only part

21

of the basis for the tortious interference claim, *see* 139 F.3d at 1476-77. The *Dow* court found that if a defendant engaged in "bad faith enforcement of a reputedly unenforceable patent" by threatening to sue knowing that the patent was invalid, *id.* at 1476, or even "[if] a holder of a valid and enforceable patent . . . knowingly [brought] baseless infringement actions against a competitor's customers," *id.* at 1477, a state-law claim for tortious interference would lie because it would address a different wrong than a simple claim for inequitable conduct before the PTO. *See id.* at 1476-78. The difference was that the former claim would be premised on "bad faith misconduct in the marketplace," as opposed to "bad faith misconduct in the PTO." *Id.* at 1477. "[T]hat the source of proof of bad faith, just one element of the tort, was purported inequitable conduct before the PTO" did not render the state claim a preempted issue of patent law. *Id.* at 1478.

In *Nobelpharma AB v. Implant Innovations, Inc.*, 141 F.3d 1059 (Fed. Cir. 1998), the Federal Circuit distinguished *Walker Process* claims from claims of inequitable conduct before the PTO by stating that "inequitable conduct is a broader, more inclusive concept than the common law fraud needed to support a *Walker Process* counterclaim," *id.* at 1069, and "a more serious finding of fraud" – "a knowing, willful and intentional act, misrepresentation or omission before the PTO" – "potentially exposes a patentee to antitrust liability," *id.* at 1070 (alteration and internal quotation marks omitted). Thus, if a court found that a "patent was acquired by means of either a fraudulent misrepresentation or a fraudulent omission and that the party asserting the patent was aware of the fraud when bringing suit, such conduct can expose a patentee to liability under the [federal] antitrust laws." *Id.*

In *Hunter Douglas, Inc. v. Harmonic Design, Inc.*, 153 F.3d 1318 (Fed. Cir. 1998), *overruled in part on other grounds by Midwest Industries, Inc. v. Karavan Trailers, Inc.*, 175

F.3d 1356, 1360-61 (Fed. Cir. 1999) (*en banc* in part), the Federal Circuit created a conduct-based test to determine what claims could and could not be raised, and found *Dow* to be "in harmony" with such an approach. *Id.* at 1336-37. The court held that federal patent law immunizes two types of conduct from state tort liability: (1) conduct before the PTO, unless the plaintiff can show that the patentholder's conduct amounted to fraud or rendered the patent application process a sham; and (2) conduct of publicizing a patent in the marketplace, unless the plaintiff can show that the patentholder acted in bad faith. *Id.* at 1335-37; *see Zenith Elecs. Corp. v. Exzec, Inc.*, 182 F.3d 1340, 1355 (Fed. Cir. 1999) ("Guided by our *Dow Chemical* and *Hunter Douglas* decisions, and consistent with the analysis previously set forth with regard to the application of federal unfair trade practice law, we hold that bad faith is a prerequisite to [a defendant's] state-law tortious interference claim; without it, the claim is preempted by patent law.").

District courts have since attempted to apply this jurisprudence. For example, in *Ciprofloxacin*, 363 F. Supp. 2d 514, the court looked at, among other things, an indirect purchaser class's state-law claim for *Walker Process*-type fraud relating to inequitable conduct before the PTO, as well as a claim relating to alleged sham litigation. The *Ciprofloxacin* court determined that defendants' omission or misrepresentation before the PTO had not risen to the level of "but for" materiality – in other words, that there was no showing of a representation or omission that caused the PTO to grant an invalid patent. *See id.* at 546 n.28. Because "a patent must be invalid before it can be a candidate for *Walker Process* fraud," the court determined that the state-law claims were preempted. *Id.* Further, the plaintiffs had failed to allege conduct other than the conduct before the PTO, such as tortious conduct in the marketplace, to save the claim from being preempted. *Id.* at 543-45 (citing *Hunter Douglas*, 153 F.3d at 1334; *Dow*, 139

23

F.3d at 1477) (finding that indirect purchasers' claim was akin to abuse-of-process counterclaim brought in *Abbott Laboratories*).

Two subsequent cases from the District of New Jersey have followed the Eastern District of New York's reasoning in *Ciprofloxacin*. In *Daiichi Sankyo, Inc. v. Apotex, Inc.*, No. 030937, 2009 WL 1437815, at *9 (D.N.J. May 19, 2009), the District of New Jersey held – in another case where there was no finding of actual fraud before the PTO – that "[s]tate law tort claims [such as tortious interference and unjust enrichment based on defendants' listing a patent in the *Orange Book* and bringing sham patent infringement litigation] are preempted by federal law if they are based on nothing more than misconduct before the PTO." *Id.* Likewise, in *In re K-Dur Antitrust Litigation*, No. 01-CV-1652, 2007 WL 5297755, at *24-25 (D.N.J. Mar. 1, 2007) – a case where plaintiffs alleged that defendants had engaged in fraudulent activity before the PTO, but the court did not reach the issue of whether defendants engaged in actual fraud (as opposed to inequitable conduct) before the PTO because it dismissed the indirect purchasers' claims for lack of standing, *see id.* at *17-19 – the Special Master determined that plaintiffs' *Walker Process* and state-law "sham litigation" claims were preempted by federal patent law. *Id.* at *23-25. In so holding, the Special Master stated that because the claims were premised solely on bad faith misconduct before the PTO, they "occup[ied] a field identical in scope to issues already reserved to and adequately addressed by federal patent law," and "[e]ven if reasonable people could disagree about the extent to which . . . Plaintiffs' state law antitrust claims rely upon conduct before the PTO, evidence of marketplace conduct . . . [wa]s sorely lacking." *Id.* at *24 (internal quotation marks omitted).

Plaintiffs argue that cases like *Ciprofloxacin* and *K-Dur* were wrongly decided, (Ps' Mem. 14-17), and their arguments have some force. I need not go so far as to agree, however, in

24

order to uphold their claims.  Although the facts of this case differ in some ways from each of the cases discussed above, I find, consistent with Federal Circuit precedent, that Plaintiffs' state-law *Walker Process*-type antitrust and/or consumer protection law claims are not preempted by federal patent law under these facts.  Plaintiffs have plausibly pleaded both fraud on the PTO and bad-faith enforcement of the patent.  As the Second Circuit in this case found, Plaintiffs have adequately pleaded the "intent to deceive" and "materiality" elements of a *Walker Process* fraud claim.  *See DDAVP Direct Purchaser Antitrust Litig.*, 585 F.3d at 692-94; *see also Ferring*, 437 F.3d at 1188-90 ("[T]he declarations themselves were 'highly material.'"; "[T]he second set of declarations, which was plagued with even more undisclosed affiliations than the first set, was absolutely critical in overcoming the Board's obviousness rejection."; "Indeed, it shows that the background, at least of the declarants Robinson and Czernichow, was not only material but was highly material.  The examiners specifically requested 'non-inventor' affidavits."); *Ferring*, 2005 WL 437981, at *9 ("The reluctance of the PTO to issue the '398 patent was evident.  Each affidavit submitted in support of its issuance was thus highly material to the prosecution history.  That three of the challenged declarations were submitted after several iterations of rejected attempts to obtain the patent's issuance speaks loudly as to motive and intent.").  Because they have also plausibly pleaded that Ferring's conduct before the PTO was a but-for reason that the '398 patent issued, *see DDAVP Direct Purchaser Antitrust Litig.*, 585 F.3d at 692-94, Plaintiffs have plausibly pleaded, consistent with *Hunter Douglas*, that Ferring's "conduct amounted to fraud or rendered the patent application process a sham," *Hunter Douglas*, 153 F.3d at 1336, which can expose Defendants to antitrust liability even if it might also violate federal patent law.

Likewise, because Plaintiffs plausibly allege bad-faith enforcement, *Dow*, 139 F.3d at 1476, not just bad behavior before the PTO, the patent laws do not preempt their state-law

claims, *see id at* 1476-77; *Nobelpharma*, 141 F.3d at 1070.  Defendants argue that Plaintiffs have

not alleged any conduct apart from misconduct before the PTO, such as wrongful conduct in the

marketplace, (Ds' Mem. 10), but that simply is not the case.  Plaintiffs allege not only that

Defendants misled the PTO, but that they engaged in bad-faith enforcement through an invalid

*Orange Book* listing, sham patent infringement litigation, and a sham citizen petition.  Plaintiffs

thus seek to remedy wrongs that go beyond inequitable conduct before the PTO.  *See Dow*, 139

F.3d at 1476-77; *see also id.* at 1478 ("Far from being a duplication of remedies, the state tort

and the federal defense address entirely different wrongs and also provide different forms of

relief.").  Like the tortious interference claim at issue in *Dow*, and unlike the abuse-of-process

claim at issue in *Abbott Laboratories*, the antitrust/unfair competition and consumer fraud claims

here "require[] entirely different elements" than those required for inequitable conduct before the

PTO," *Dow*, 139 F.3d at 1477, and the tort occurred not at the PTO but later in the marketplace,

*id.*, even though the conduct before the PTO might be used to prove it, *id.* at 1478.

    In any event, Defendants have cited no case law for the proposition that wrongful

conduct beyond the PTO and in the marketplace is required where fraud on the PTO is alleged.

Under Federal Circuit precedent, it seems that either fraud on the PTO *or* bad faith conduct in the

marketplace is sufficient to strip a patent holder of its antitrust immunity and render an antitrust

claim not preempted by patent law.  *See Hunter Douglas*, 153 F.3d at 1336 (no preemption if

plaintiff alleges defendant committed fraud before PTO or publicized patent in bad faith).[9]

---

[9] *Ciprofloxacin* and *Daiichi Sankyo* are distinguishable from the instant case because the district courts in both cases found that plaintiffs had failed to allege fraud before the PTO.  In *Ciprofloxacin*, the court specifically stated that a patent that was held to be invalid could "be a candidate for *Walker Process* fraud," but that that finding could not be made under the facts of that case.  363 F. Supp. 2d at 546 n.28; *see Daiichi Sankyo*, 2009 WL 1437815, at *9 ("With no fraud, the subsequent Orange Book listing and lawsuit were not wrongful and cannot form an independent basis for [plaintiff's monopolization] counterclaims.").  It also acknowledged that sham litigation could support a state-law *Walker Process*-type claim, but simply found that basis unavailable in the case before it because defendants had succeeded in the litigations and plaintiffs had admittedly infringed.  *See Ciprofloxacin*, 363 F. Supp. 2d at 543-44, 547.  *Ciprofloxacin* also makes the puzzling argument that while threats to litigate would constitute marketplace

26

Finally, allowing state-law *Walker Process*-type antitrust claims will not impair the

purposes or objectives of federal patent law. *See Walker Process*, 382 U.S. at 179-80 (Harlan, J.,

concurring); *Exzec*, 182 F.3d at 1354; *Dow*, 139 F.3d at 1475. The Court sees no reason why the

reasoning of these cases would not apply equally to state-law-based *Walker Process*-type claims

as to federal-law-based claims. Accordingly, Defendants' Motion to Dismiss Plaintiffs' antitrust

and consumer protection law claims on preemption grounds is denied. The Complaint

adequately alleges conduct that, if proven, would strip Defendants of their immunity as patentees

from antitrust claims and would neither duplicate the wrongs addressed or the remedies available

under the patent laws, nor impede or impair those laws.

### b.    Citizen Petition

Plaintiffs are not preempted from basing their state-law antitrust and/or consumer

protection claims in part on Defendants' allegedly baseless citizen petition for similar reasons.

In *Buckman Co. v. Plaintiffs' Legal Committee*, 531 U.S. 341 (2001), the Supreme Court

analyzed whether plaintiffs' state-law fraud-on-the-FDA claims for defendants' fraudulent

representations to the FDA in the course of obtaining approval to market bone screws –

representations without which the FDA may not have approved the screws – were preempted by

the Federal Food, Drug and Cosmetic Act, 21 U.S.C. §§ 301-399d, as amended (the "FDCA").

*See id.* at 343. The Court found that "[p]olicing fraud against federal agencies is hardly a field

which the States have traditionally occupied" and that "the relationship between a federal agency

and the entity it regulates is inherently federal in character because the relationship originates

---

misconduct sufficient to avoid preemption, an actual lawsuit would not. *See id.* at 544-45. To this Court, it seems
that going beyond threats and actually instituting a bad-faith lawsuit is at least as much "in the marketplace" as the
threat, if not more so. Similarly in *K-Dur*, 2007 WL 5297755, the Special Master found that the wrongs for which
state-law damages were sought amounted only to bad-faith misconduct before the PTO. *See id.* at *24. He
apparently did not interpret the complaint as alleging fraud before the PTO. Because it also did not allege any
marketplace conduct, *see id.* at *25, state law claims were preempted, *see id.* Here I have found both fraud before
the PTO and marketplace conduct to have been plausibly pleaded.

from, is governed by, and terminates according to federal law." *Id.* at 347 (internal quotation marks omitted). Because the Court was concerned with FDA applicants having to "comply[] with the FDA's detailed regulatory regime in the shadow of 50 States' tort regimes," *id.* at 350, and found that the FDA was "empowered to investigate suspected fraud, . . . respond to fraud by seeking injunctive relief and civil penalties, . . . [and] thus has at its disposal a variety of enforcement options that allow it to make a measured response to suspected fraud on the Administration," *id.* at 349 (internal citations omitted), the Court held that state-law fraud-on-the-FDA claims "would exert an extraneous pull on the [FDCA]" and are impliedly preempted, *id.* at 353.

Cases interpreting *Buckman* have refined the import of its holding based on different sets of facts. For example, in *Desiano v. Warner-Lambert & Co.*, 467 F.3d 85 (2d Cir. 2006), *aff'd by an equally divided court sub nom. Warner-Lambert & Co. v. Kent*, 552 U.S. 440 (2008) (*per curiam*), the Second Circuit analyzed whether a Michigan state statute that granted immunity to drug makers for compliance with FDA requirements, but which had an exception if a drug maker committed fraud on the FDA, should cause state-law product liability claims to be preempted. *Id.* at 87-88. The court held that the state-law claims were not preempted for three reasons. First, the court applied the presumption against preemption because the Michigan legislature enacted this particular statute "to rein in state-based tort liability," which fell "squarely within [the legislature's] prerogative to regulate matters of health and safety," a prerogative generally left to the States. *Id.* at 94 (alteration and internal quotation marks omitted). Second, the court distinguished *Buckman* fraud-on-the-FDA claims, for which "proof of fraud against the FDA is *alone sufficient* to impose liability," from "freestanding allegations of wrongdoing apart from the defendant's purported failure to comply with FDA disclosure requirements." *Id.* at 95 (emphasis

in original) (internal quotation marks omitted).  And third, the court noted that proof of fraud

before the FDA was not an element of a products liability claim; rather, the fraud would only be

important if the defendant company sought to assert an affirmative defense that the FDA had

approved the drug as in compliance with the FDCA. *Id.* at 96.

More recently, a district court within this Circuit looked at cases interpreting *Buckman*

and stated that

> a state law claim only endures if it manages to incorporate, but not depend
> entirely upon, an FDCA violation and is premised on conduct that would give rise
> to liability under traditional common law principles. On the other hand, if
> "defendant's conduct is not of this type," *i.e.*, would not expose it to liability but
> for the FDCA, then the plaintiff is effectively suing for a violation of the FDCA
> (no matter how the plaintiff labels the claim), and the plaintiff's claim is thus
> impliedly preempted under *Buckman*.

*In re Bayer Corp. Combination Aspirin Prods. Mktg. & Sales Practices Litig.*, 701 F. Supp. 2d

356, 369 (E.D.N.Y. 2010) (internal quotation marks omitted).  In *Bayer*, the issue was whether

defendant's false or deceptive advertising in the marketplace, including false claims to

consumers that the FDA had approved defendant's products, could be attacked using state-law

false advertising and consumer protection law claims. *See id.* at 362, 365.  The court found that

the representations concerning FDA approval had been directed at consumers, and thus

plaintiffs' claim was a "traditional [state law] claim of consumer misrepresentation, not an

attempt to enforce the FDCA's labeling requirements." *Id.* at 375.  "In other words, plaintiffs

[had] threaded the needle and alleged conduct that violates the FDCA but sounds in traditional

principles of state law and would give rise to recovery even had the FDCA never been enacted."

*Id.*

Here, neither party has cited a case that analyzes whether state-law antitrust and/or

consumer protection claims based on an allegedly baseless citizen petition are preempted by the

29

FDCA, and the Court is aware of none.[10]   In light of the case law that does exist, I find that the claims here are more akin to the claims in *Desiano* or *Bayer* than in *Buckman*.   Plaintiffs are not merely suing on a claim where "proof of fraud against the FDA is *alone sufficient* to impose liability," *Desiano*, 467 F.3d at 95 (emphasis in original), like the fraud-on-the-FDA claim raised in *Buckman*.[11]   Rather, they bring antitrust and consumer protection claims, which claims make "freestanding allegations of wrongdoing apart from the defendant's purported failure to comply with FDA disclosure requirements," *id.* at 95 – *i.e.*, anticompetitive conduct designed to maintain a fraudulent monopoly through a knowingly invalid patent – sufficient for these claims not to be preempted.   Further, proof of fraud on the FDA is not an element of an antitrust claim.   It may be *evidence* of such a claim, and it may serve to strip Defendants of the antitrust immunity to which they would otherwise be entitled as patentees, but it is not an affirmative element that Plaintiffs are required to prove to make out an antitrust claim.   Thus, Plaintiffs have "thread[ed] the needle . . . [by plausibly pleading] that [Defendants] ha[ve] violated the FDCA, but [Plaintiffs'] claims are not entirely premised on that violation and that [Defendants'] wrongdoing would entitle [Plaintiffs] to recovery under traditional [antitrust and/or consumer protection law] state law principles." *Bayer*, 701 F. Supp. 2d at 370.[12]

---

[10] The dearth of case law on this issue may indicate that such claims are not preempted by FDA law.  Moreover, parties have brought sham citizen petition claims in the context of antitrust litigation and it does not appear that the issue of preemption was raised in those cases.  *See, e.g., In re Flonase Antitrust Litig.*, 692 F. Supp. 2d 524 (E.D. Pa. 2010) (indirect purchasers alleged sham citizen petitions violated state antitrust laws); *Spear Pharm., Inc. v. William Blair & Co.*, 610 F. Supp. 2d 278 (D. Del. 2009) (sham citizen petition claim adjudicated in case with federal and state law antitrust claims); *Abbott Labs. v. Teva Pharm. USA, Inc.*, 432 F. Supp. 2d 408 (D. Del. 2006) (same).

[11] A fraud-on-the-FDA claim is akin to the abuse-of-process claim that was found preempted in *Abbott Laboratories*, which I have already found is not analogous to the issues here.  Both in *Buckman* and *Abbott Laboratories*, plaintiffs sought only to bring claims that would remedy the misconduct before a federal agency.  As previously stated, Plaintiffs' antitrust and consumer protection claims here seek to remedy a wrong separate from the alleged fraud before the PTO and the sham citizen petition filed with the FDA – namely, Defendants' alleged conduct that had the effect of keeping generic DDAVP manufacturers out of the marketplace, which in turn enabled Defendants to sell DDAVP to Plaintiffs at supra-competitive prices.

[12] Further, Defendants' argument, (Ds' Mem. 12), that allowing this case to go forward would frustrate the Congressional goal of encouraging full disclosure to the FDA is, to put it charitably, without merit.  It is difficult to see how allowing Plaintiffs to use a Defendant's misleading submission to the FDA as evidence of monopolistic

### 3.     Other Grounds for Dismissing Plaintiffs' State-Law Claims

Defendants argue that if Plaintiffs' state-law claims are not dismissed on standing or preemption grounds, they should be dismissed for other reasons. I address each of Defendants' arguments below.

### a.     Arizona, Colorado, Idaho, Michigan, Nevada, New Mexico, New York, South Dakota and Tennessee Consumer Protection Laws

Defendants argue that the consumer protection laws of Arizona, Colorado, Idaho, Michigan, Nevada, New Mexico, New York, South Dakota and Tennessee do not apply to antitrust violations or similar anticompetitive conduct, but rather "only apply to conduct that constitutes a *fraud upon consumers*," and that because there are no allegations that Defendants engaged in communications with any of the Indirect Purchaser Plaintiffs, the claims fail. (Ds' Mem. 16-17 (emphasis in original); *see* Ds' Reply Mem. 8 ("It is not sufficient to allege a fraud upon government entities (*e.g.*, the PTO, FDA, or federal courts) that may have indirectly caused consumers to pay higher prices for a product.")) Plaintiffs argue that many courts have held that a direct representation to a consumer is unnecessary, and that they have alleged deception before the PTO and the FDA by Defendants that led consumers to pay too much for DDAVP. (*See* Ps' Mem. 29-31.)

As will become clear in the analysis below, I find at this stage that Plaintiffs have plausibly pleaded misrepresentations that, although they may not have been made directly to consumers, had the kind of effect on end payors that these statutes seek to remedy. *See, e.g., Flonase*, 692 F. Supp. 2d at 536 n.8 ("The filing of a citizen petition to the FDA requires that the

---

intent could do anything other than *discourage* such misleading conduct and encourage the fullest possible disclosure. Likewise, Defendants' argument that Plaintiffs here are trying to police citizen petitions, (*id.*), is meritless. Plaintiffs are not seeking any remedy that would vindicate the FDA, but are simply trying to use Defendants' alleged misconduct before the FDA as evidence of Defendants' monopolistic intent.

petition include a certification which states, *inter alia*, that the petition 'includes representative

data and information known to the petitioner which are unfavorable to the petition.' 21 C.F.R. §

10.30 (2009).  If the Plaintiffs had alleged facts to show that the petitions [defendant] filed made

statements that [defendant] knew were contradicted by data and information, and that

[defendant] knowingly excluded such information, this might be sufficient to allege a

misrepresentation" on indirect purchaser plaintiffs); *Teva Pharm.*, 432 F. Supp. 2d at 433-34

(consumer deception plausibly alleged because patents were obtained by fraud, and defendants

"failed to demonstrate that such allegations [we]re insufficient" to state claim under any state

statute).

### 1.    Arizona

To state a claim of consumer fraud under the Arizona Consumer Fraud Act (the

"ACFA"), Ariz. Rev. Stat. Ann. §§ 44-1521 to -1534, "a plaintiff must show [that the defendant

made] 'a false promise or misrepresentation . . . in connection with the sale or advertisement of

merchandise and consequent and proximate injury resulting from the promise.'" *Sheet Metal*

*Workers Local 441 Health & Welfare Plan v. GlaxoSmithKline, PLC*, 737 F. Supp. 2d 380, 403

(E.D. Pa. 2010) (quoting *Kuehn v. Stanley*, 91 P.3d 346, 351 (Ariz. Ct. App. 2004)).  "An injury

occurs when a consumer relies, even unreasonably, on false or misrepresented information. . . .

[R]eliance is a required element under Arizona's consumer fraud statute . . . ." *Kuehn*, 91 P.3d at

351.

An allegation that a defendant engaged in deception, even if to a regulatory agency rather

than consumers directly, may be sufficient to state a claim under the ACFA.  *See Flonase*, 692 F.

Supp. 2d at 536 & n.8 (seemingly accepting indirect plaintiffs' argument that if a citizen petition

submitted to FDA included statements that defendant "knew were contradicted by data and

information, and . . . knowingly excluded such information," this might be sufficient to allege misrepresentation to sustain ACFA claim); *see also Sheet Metal*, 737 F. Supp. 2d at 403-04 (determining that defendant's material misstatements – including *Walker Process* fraud in connection with patent – may constitute misrepresentation sufficient to state claim under ACFA, but finding on facts of case that defendants had made objectively baseless, although "not necessarily *fraudulent*" representations, and thus granting motion to dismiss ACFA claim) (emphasis in original); *cf. Persky v. Turley*, Nos. 88-CV-1830, 88-CV-2089, 1991 WL 327434, at *9-10 (D. Ariz. Dec. 19, 1991) (looking to Title 15 of the Federal Trade Commission Act, which allows plaintiffs to plead fraud on the market to state a claim, and therefore finding that plaintiffs stated claim under AFCA because they pleaded that they relied on market price induced by defendant's allegedly false registration statements and prospecti).

Here, Plaintiffs allege that Defendants submitted fraudulent declarations to the PTO, which caused the '398 patent to issue, and brought a baseless citizen petition before the FDA in which Ferring failed to cite an Aventis study "that reached conclusions flatly inconsistent with Ferring's own position," (Compl. ¶ 111), thereby violating 21 C.F.R. § 10.30(b)'s requirement to submit all representative data and information known to the petitioner that is unfavorable to the petition. Because of Ferring's alleged fraudulent conduct before the PTO and misrepresentations to the FDA, Barr and Teva were delayed in bringing generic DDAVP drugs to market, and Plaintiffs paid supra-competitive prices for DDAVP, thereby sustaining "consequent and proximate injury" from Defendants' alleged fraudulent conduct. *Kuehn*, 91 P.3d at 351. In paying supra-competitive prices for DDAVP, consumers arguably relied on Defendants' false representations to those agencies regarding the patentability and safety of their product and its generic equivalents, even though the alleged false representations were not made directly to

33

them. Thus, I find that the Indirect Purchaser Plaintiffs have plausibly stated a claim under the ACFA.[13]

## 2.   Colorado

Defendants argue that Plaintiffs fail to allege a deceptive trade practice that induced the Plaintiffs to act or refrain from acting, and thus the claims under the Colorado Consumer Protection Act (the "CCPA"), Colo. Rev. Stat. §§ 6-1-101 to -115, should be dismissed. (Ds' Mem. 17-18.) To state a private cause of action under the CCPA, a plaintiff must show:

> (1) that the defendant engaged in an unfair or deceptive trade practice; (2) that the challenged practice occurred in the course of defendant's business . . . ; (3) that it significantly impacts the public as actual or potential consumers of the defendant's goods . . . ; (4) that the plaintiff suffered injury in fact to a legally protected interest; and (5) that the challenged practice caused the plaintiff's injury.

*Rhino Linings USA, Inc. v. Rocky Mountain Rhino Lining, Inc.*, 62 P.3d 142, 146-47 (Colo. 2003) (citing *Hall v. Walter*, 969 P.2d 224, 235 (Colo. 1998)). Under the CCPA, "[a] person engages in a deceptive trade practice when . . . such person . . . [k]nowingly makes a false representation as to the characteristics, ingredients, uses, benefits, alterations, or quantities of goods . . . or a false representation as to the . . . approval [or] status . . . therewith." Colo. Rev. Stat. § 6-1-105(1)(e). A false representation under the CCPA may be either (1) an affirmative misrepresentation made "with knowledge of its untruth, or recklessly and willfully made without regard to its consequences, and with an intent to mislead and deceive" that "induce[s] a party to act, refrain from acting, or ha[s] the capacity or tendency to attract consumers," *Rhino Linings*,

---

[13] Defendants argue that Plaintiffs' claim under Article 14, Section 15 of the Arizona Constitution, (Compl. ¶ 140(a)), must be dismissed because "there is no separate claim under that state's constitutional provision." (Ds' Mem. 17 n.8.) Defendants cite to *Bunker's Glass Co. v. Pilkington PLC*, 47 P.3d 1119, 1124 (Ariz. Ct. App. 2002), but *Bunker's* does not support Defendants' contention. Rather, *Bunker's* stands for the proposition that statutes adopted pursuant to Arizona's constitutional antitrust provision must be read liberally to allow for claims to be raised by indirect purchasers because "[t]o do otherwise would frustrate the intent of Article 14, Section 15 of the Arizona Constitution." *Id. Bunker's* does not address either way whether a separate constitutional antitrust claim exists in Arizona, and Defendants have cited no other authority for their argument. Defendants' Motion to Dismiss Plaintiffs' claims under the antitrust provision of the Arizona Constitution is therefore denied.

62 P.3d at 147 (internal quotation marks omitted); *accord Warner v. Ford Motor Co.*, No. 06-CV-2443, 2008 WL 4452338, at *8 (D. Colo. Sept. 30, 2008), or (2) a material omission, if the defendant failed to "disclose material information . . . which information was known at the time of an advertisement or sale if such failure to disclose such information was intended to induce the consumer to enter into a transaction," Colo. Rev. Stat. § 6-1-105(1)(u); *see Warner*, 2008 WL 4452338, at *9-18 (when consumer alleges that he or she would not have purchased product had information been disclosed, consumer has alleged facts sufficient to support an inference that the alleged omission caused his or her injuries and thus has stated actionable misrepresentation under CCPA). Generally, "[a] defendant has a duty to disclose to a plaintiff with whom he or she deals material facts that 'in equity or good conscience' should be disclosed." *Mallon Oil Co. v. Bowen/Edwards Assocs.*, 965 P.2d 105, 111 (Colo. 1998) (quoting *Smith v. Boyett*, 908 P.2d 508, 512 (Colo. 1995)).

In *Hall*, the Supreme Court of Colorado held that a misrepresentation made to a third party could be actionable under the CCPA. In that case, in extensive advertising of individual lots for sale in a subdivision, petitioners told potential purchasers that they would have legal access to their properties by two access routes, one of which was a road that ran through respondents' land. As a result of this misrepresentation, respondents were injured when petitioners and purchasers cut locks and knocked down fences and gates to gain access to respondents' land. The court held that respondents' injuries were causally linked to petitioners' deceptive practices, and thus respondents stated a claim under the CCPA, even though petitioners never made misrepresentations directly to respondents. *See* 969 P.2d at 237-38; *cf. In re New Motor Vehicles Canadian Exp. Antitrust Litig.*, 350 F. Supp. 2d 160, 179-80 (D. Me. 2004) (dismissing CCPA claim where plaintiffs failed to allege "fraudulent or deceptive conduct

by the defendants, and certainly none that is material, *i.e.*, a deception that caused the plaintiffs' injury (overpayment)"); *Rhino Linings*, 62 P.3d at 149-50 (distinguishing *Hall* on basis that *Rhino Linings* plaintiff and defendant were contractually bound, and that defendant breached contract by engaging another dealer in violation of plaintiff's exclusivity agreement, giving plaintiff "a theory of recovery not available to the [respondent]-landowners in *Hall*," and finding that in *Hall*, false statements – not breach of contract – induced third-party purchasers to buy lots, which in turn led to respondents' injury). *But see Sheet Metal*, 737 F. Supp. 2d at 404 n.10, 408 & n.12 (finding that plaintiffs did not state a claim for *Walker Process* fraud, and stating, without citation to Colorado authority, that because plaintiffs claimed only false statements to PTO, not deceptive conduct aimed at consumers, plaintiffs had failed to state CCPA claim).

Although the *Sheet Metal* court determined that a CCPA claim fails where the deceptive conduct is not aimed at consumers, I do not find a basis in caselaw for that determination. Rather, relying on the holdings of *Hall* and *Warner*, I find that Plaintiffs have plausibly pleaded a claim under the CCPA based on Defendants' fraudulent conduct before the PTO and FDA, which injured Plaintiffs by causing them to pay supra-competitive prices for DDAVP. *See, e.g.*, *Remediation Prods., Inc. v. Adventus Ams., Inc.*, No. 07-CV-153, 2009 WL 6066968, at *6 (W.D.N.C. July 30, 2009) (determining that plaintiff stated a claim under CCPA because of, among other things, defendant's knowing, intentional, and willful assertion of patent that was obtained by fraud before PTO); *cf. Warner*, 2008 WL 4452338, at *9-18 (but for omission of material information, consumers would not have purchased product known by defendants to be defective). Here, Defendants fraudulently represented to third parties (the PTO and FDA) and the marketplace that their DDAVP tablets were a legitimately patentable and/or patented

product, for which it was therefore worth paying a premium. If proven, such conduct could meet the elements of the CCPA.

### 3.   Idaho

Defendants argue that Plaintiffs' claims under the Idaho Consumer Protection Act (the "ICPA"), Idaho Code Ann. §§ 48-601 to -619, must be dismissed because Plaintiffs fail to allege deceptive or unconscionable conduct aimed at consumers. (Ds' Mem. 18.) "The purpose of [the ICPA] is to protect both consumers and businesses against unfair methods of competition and unfair or deceptive acts and practices in the conduct of trade or commerce," Idaho Code Ann. § 48-601, and the statute is to be construed liberally, *W. Acceptance Corp. v. Jones (In re W. Acceptance Corp.)*, 788 P.2d 214, 216 (Idaho 1990). The ICPA provides, in relevant part, that "[a]ny person who purchases . . . goods . . . and thereby suffers any ascertainable loss of money . . . as a result of the use . . . by another person of a method, act or practice declared unlawful by this chapter . . . may bring an action to recover actual damages or one thousand dollars ($1,000), whichever is the greater . . . ." Idaho Code Ann. § 48-608(1). Section 48-603 enumerates the unfair and deceptive acts declared unlawful under the ICPA, including, among other things, "where a person knows, or in the exercise of due care should know, that he has in the past, or is: . . . [c]ausing likelihood of . . . misunderstanding as to the . . . sponsorship [or] approval . . . of goods" or "[e]ngaging in any act or practice which is otherwise misleading, false, or deceptive to the consumer." *Id.* § 48-603(2), (17).

Defendants have not cited case law in which a court has dismissed consumers' claims under the ICPA if they suffered monetary loss as a result of a defendant's deceptive acts toward a third party. Further, Defendants only cite to *Sheet Metal*, a case where the court: (1) determined (unlike here) that defendants had not engaged in fraudulent conduct, *see* 737 F. Supp.

37

2d at 404 n.10, and (2) considered an entirely different section of the ICPA, Section 48-603C(d)(2), *id.* at 410, which "is designed to prohibit unconscionable 'sales conduct' that is directed at the consumer," *State ex rel. Wasden v. Daicel Chem. Indus., Ltd.*, 106 P.3d 428, 435 (Idaho 2005). I thus follow the Supreme Court of Idaho's directive to interpret the ICPA liberally, and find, for the reasons already stated, that Plaintiffs plausibly plead claims under either of subsections (2) or (17) of ICPA Section 48-603. Defendants' Motion to Dismiss the ICPA claims is therefore denied.

### 4. **Michigan**

Defendants argue that Plaintiffs' claims under the Michigan Consumer Protection Act (the "MCPA"), Mich. Comp. Laws §§ 445.901-.922, must be dismissed because Plaintiffs fail to allege injuries caused by Defendants' false representations. (Ds' Mem. 18.) What qualifies as an unfair, unconscionable, or deceptive method, act, or practice within the meaning of MCPA closely tracks those acts enumerated in the ICPA, including "[c]ausing a . . . misunderstanding as to the . . . sponsorship [or] approval . . . of goods," "[r]epresenting that goods . . . have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities that they do not have," or "[f]ailing to reveal a material fact, the omission of which tends to mislead or deceive the consumer, and which fact could not reasonably be known by the consumer." Mich. Comp. Laws §§ 445.903(1)(a), (c), (s). Although the Michigan Court of Appeals has stated that because many of the MCPA's prohibited practices involve fraud, the statute should be construed with reference to the common-law tort of fraud, meaning that "a plaintiff must have suffered injury as a result of his reliance on the defendant's false representation," *Mayhall v. A.H. Pond Co.*, 341 N.W.2d 268, 270 (Mich. Ct. App. 1983) (internal quotation marks omitted), the Michigan Supreme Court has stated that "[t]he Consumer Protection Act was enacted to provide an

enlarged remedy for consumers who are mulcted by deceptive business practices" and thus

"should be construed liberally to broaden the consumers' remedy, especially in situations

involving consumer frauds affecting a large number of persons," *Dix v. Am. Bankers Life*

*Assurance Co. of Fla.*, 415 N.W.2d 206, 209 (Mich. 1987); *see id.* (holding that MCPA does not

require class members to "prove reliance on the alleged misrepresentations. It is sufficient if the

class can establish that a reasonable person would have relied on the representations."); *see also*

*Gasperoni v. Metabolife, Int'l Inc.*, No. 00-CV-71255, 2000 WL 33365948, at *7 (E.D. Mich.

Sept. 27, 2000) ("Under [the MCPA], reliance and causation are satisfied by proof that plaintiffs

purchased and consumed the product."). For the same reasons that I have allowed Plaintiffs'

other consumer protection claims to move forward, Plaintiffs have plausibly pleaded

misrepresentations upon which they ultimately relied when they purchased DDAVP, and

Defendants' Motion to Dismiss Plaintiffs' MCPA claims is therefore denied.

### 5.   Nevada

Defendants argue that Plaintiffs' claims under the Nevada Deceptive Trade Practices Act

(the "NDTPA"), Nev. Rev. Stat. §§ 598.0903-.0999, should be dismissed because Plaintiffs do

not allege any deceptive trade practices that "exploit[ed] unwitting consumers." (Ds' Mem. 18-

19.) Additionally, Defendants argue that only elderly or disabled persons may bring NDTPA

claims in private actions, and therefore all claims under the NDPTA not alleged by elderly or

disabled Plaintiffs should be dismissed. (*Id.* at 19 (citing Nev. Rev. State. Ann. § 598.0977).)

I find Defendants' first argument to be without merit. The Nevada statute entitled

"Actions by victims of fraud," states that "[a]n action may be brought by any person who is a

victim of consumer fraud," Nev. Rev. Stat. § 41.600(1), and defines "consumer fraud" to include

a "deceptive trade practice as defined in [NDTPA Sections] 598.0915 to 598.0925, inclusive," *id.*

§41.600(2)(e).  Under NDTPA Section 598.0915, a "deceptive trade practice" is defined as, among other things, "[k]nowingly mak[ing] a false representation as to the . . . sponsorship, approval or certification of goods or services for sale" or "[k]nowingly mak[ing] a false representation as to the characteristics, ingredients, uses, benefits, alterations or quantities of goods or services for sale."  Nev. Rev. Stat. § 598.0915(2), (5); *see Picus v. Wal-Mart Stores, Inc.*, 256 F.R.D. 651, 658 (D. Nev. 2009) (determining, absent state law specifying the elements of an NDTPA private cause of action, that "the Nevada Supreme Court would require, at a minimum, a victim of consumer fraud to prove that (1) an act of consumer fraud by the defendant (2) caused (3) damage to the plaintiff").  For the reasons already stated, Plaintiffs' allegations of fraudulent acts that caused Plaintiffs' injuries are sufficient to state a claim under the NDTPA.

Although Plaintiffs do not oppose Defendants' contention that only elderly or disabled people may bring claims under the NDPTA, (Ds' Mem. 19), and I could thus deem Plaintiff's claim abandoned, *see, e.g., Laurent v. G & G Bus Serv., Inc.*, No. 10-CV-4055, 2011 WL 2683201, at *5 (S.D.N.Y. May 17, 2011); *Lipton v. Cnty. of Orange, N.Y.*, 315 F. Supp. 2d 434, 446 (S.D.N.Y. 2004), I find that this argument also lacks merit.  As stated above, "[a]n action may be brought by *any person* who is a victim of consumer fraud," including those subjected to deceptive trade practices under the NDPTA.  Nev. Rev. Stat. § 41.600(1), (2)(e) (emphasis added).  The section of the NDPTA that the Defendants cite, (Ds' Mem. 19 (citing Nev. Rev. Stat. § 598.0977)), sets forth the remedies an elderly or disabled person may receive if subjected to a deceptive trade practice, and refers to another section of the NDPTA that states only that "if the court finds that a person has engaged in a deceptive trade practice directed toward an elderly person or a person with a disability, the court may, *in addition to any other civil or criminal*

*penalty*, impose a civil penalty of not more than $12,500 for each violation," Nev. Rev. Stat. §

598.0973(1) (emphasis added). In other words, while any victim of consumer fraud may bring a

civil action, elderly and disabled persons may recover more for each violation.[14] *See Nev. Power*

*Co. v. Eighth Judicial Dist. Court of Nev.*, 102 P.3d 578, 583 n.7 (Nev. 2004) ("NRS 41.600,

however, provides for a private cause of action by a person who is a victim of consumer fraud

and defines 'consumer fraud' to include '[a] deceptive trade practice as defined in NRS 598.0915

to 598.0925, inclusive.'") (quoting Nev. Rev. Stat. § 41.600(2)(e)). For these reasons, Plaintiffs

have plausibly pleaded claims under the NDTPA and Defendants' Motion to Dismiss these

claims is denied.

### 6.   New Mexico

Defendants argue that Plaintiffs' claims under the New Mexico Unfair Practices Act (the

"NMUPA"), N.M. Stat. Ann. §§ 57-12-1 to -26, fail because they do not allege that Defendants

made misrepresentations to consumers in connection with a sale or other similar transaction.

(Ds' Mem. 19.) Like the Arizona statute previously discussed, the NMUPA defines an "unfair or

deceptive trade practice" in relevant part as "a false or misleading . . . representation of any kind

knowingly made in connection with the sale . . . of goods . . . by a person in the regular course of

the person's trade or commerce, that may, tends to or does deceive or mislead any person,"

including "causing . . . misunderstanding as to the . . . sponsorship [or] approval . . . of goods" or

---

[14] I respectfully disagree with the courts in *In re Wellbutrin XL Antitrust Litig.*, 260 F.R.D. 143 (E.D. Pa. 2009), and *In re Chocolate Confectionary Antitrust Litig.*, 749 F. Supp. 2d 224 (M.D. Pa. 2010), each of which determined that "[t]he only provision of [the NDTPA] providing for a private civil action is limited to suits by an elderly person or a person with a disability." *Wellbutrin*, 260 F.R.D. at 163 (internal quotation marks omitted); *accord Chocolate*, 749 F. Supp. 2d at 234. For the reasons explained above, the language of the statute does not support such a finding, and NDTPA claims have been raised by non-elderly or disabled persons and companies alike. *See, e.g., Windisch v. Hometown Health Plan, Inc.*, No. 08-CV-664, 2010 WL 786518, at *1, 5-7 (D. Nev. 2010) (putative class of physicians stated NDPTA claim by alleging that defendants, companies involved in the management of health insurance, made representations to physicians by not adequately disclosing how to properly code services for insurance reimbursement purposes); *S. Serv. Corp. v. Excel Bldg. Servs., Inc.*, 617 F. Supp. 2d 1097, 1099 (D. Nev. 2007) (business harmed by competitors' deceptive trade practices may bring consumer fraud claims under NDPTA).

"representing that goods . . . have sponsorship, approval, characteristics, ingredients, uses, benefits or quantities that they do not have." N.M. Stat. Ann. § 57-12-2(D)(2), (5); *see In re Aftermarket Filters Antitrust Litig.*, No. 08-CV-4883, 2009 WL 3754041, at *9 (N.D. Ill. Nov. 5, 2009) ("'[U]nconscionable trade practices' include all sales that either take advantage of the lack of knowledge, ability, experience, or capacity of a person to a grossly unfair degree, or result in a gross disparity between the value received and the price paid."); *cf. id.* ("Federal courts have generally permitted claims under the [NMUPA] in price fixing cases if the plaintiff alleges a gross disparity between the price paid for the product and the value received. In the instant case plaintiffs plead that they paid 'supra-competitive' prices for the filters they received. This allegation is sufficient to allege gross disparity.") (internal citation omitted). For the same reasons that Plaintiffs' ACFA claims were not dismissed, Defendants' Motion to Dismiss Plaintiffs' NMUPA claims is denied.

### 7.   New York

Defendants argue that Plaintiffs have failed to allege a deceptive act targeted at consumers (as opposed to a federal agency or a competitor), as is required to plead a claim under New York Deceptive Acts and Practices Law, N.Y. Gen. Bus. Law § 349 ("Section 349"). (Ds' Mem. 19-20.) The New York State legislature passed Section 349 to provide a private right of action to consumers injured by "[d]eceptive acts or practices in the conduct of any business, trade or commerce or in the furnishing of any service in this state." N.Y. Gen. Bus. Law § 349(a); *see Gaidon v. Guardian Life Ins. Co. of Am.*, 94 N.Y.2d 330, 352 (1999) (discussing private rights of action under Section 349). "To make out a prima facie case under Section 349, a plaintiff must demonstrate that (1) the defendant's deceptive acts were directed at consumers,

(2) the acts are misleading in a material way, and (3) the plaintiff has been injured as a result." *Maurizio v. Goldsmith,* 230 F.3d 518, 521 (2d Cir. 2000).

The first element of a Section 349 claim requires a plaintiff to plead a "consumer-oriented act," a term that is "construed liberally" and includes actions that "cause any 'consumer injury or harm to the public interest.'" *New York v. Feldman,* 210 F. Supp. 2d 294, 301 (S.D.N.Y. 2002) (quoting *Securitron Magnalock Corp. v. Schnabolk,* 65 F.3d 256, 264 (2d Cir. 1995)); *accord Maurizio,* 230 F.3d at 522 ("It is clear that the gravamen of the [Section 349] complaint must be consumer injury or harm to the public interest.") (internal quotation marks omitted). A plaintiff will satisfy the pleading burden by "demonstrat[ing] that the acts or practices have a broader impact on consumers at large." *Oswego Laborers' Local 214 Pension Fund v. Marine Midland Bank, N.A.,* 85 N.Y.2d 20, 25 (1995). Further, antitrust conduct "imbued with a degree of subterfuge," *Leider v. Ralfe,* 387 F. Supp. 2d 283, 295 (S.D.N.Y. 2005), is sufficient to state a claim under Section 349 where consumers have felt the ultimate effect of such deception. *See, e.g., Macquarie Grp. Ltd. v. Pac. Corporate Grp., LLC,* No. 08-CV-2113, 2009 WL 539928, at \*9 (S.D. Cal. Mar. 2, 2009) (plaintiffs' allegations that defendant orchestrated scheme designed to prevent plaintiffs' entry into market, thereby allowing defendant to charge supra-competitive prices, stated Section 349 claim because such conduct "undermines New York's interest in an honest marketplace in which economic activity is conducted in a competitive manner"); *Feldman,* 210 F. Supp. 2d at 301-02 (plaintiffs stated claim under Section 349 where defendants rigged bids and skewed prices, thereby depriving the public of an "honest marketplace" at public stamp auction, because defendants' conduct caused injury to marketplace participants who relied on competitive bidding process to obtain best prices for stamps offered); *City of N.Y. v. Coastal Oil N.Y., Inc.,* No. 96-CV-8667, 1998 WL 82927, at \*7 & n.5 (S.D.N.Y.

43

Feb. 25, 1998) (contract bidder's alleged "scheme" "distorted the market for fuel oil" and

affected the "public at large, and . . . plaintiffs in particular").

For the reasons already stated, because Defendants' conduct was plausibly "imbued with

a degree of subterfuge," *Leider*, 387 F. Supp. 2d at 295, and the fraud was plausibly designed to

prevent competitors' entry into the market, thereby allowing Defendants to overcharge

consumers for DDAVP, Plaintiffs have stated a claim under Section 349.

### 8.   South Dakota

Defendants argue that Plaintiffs' claims under the South Dakota Deceptive Trade

Practices Act (the "SDDTPA"), S.D. Codified Laws §§ 37-24-1 to -51, should be dismissed for

failure to allege deceptive acts made in connection with a sale or advertisement and/or a

misrepresentation of fact on which Plaintiffs relied that caused injury.  (D's Mem. 20.)  Under

the SDDTPA, it is a deceptive trade practice to "[k]nowingly and intentionally act, use, or

employ any deceptive act or practice, fraud, false pretense, false promises, or misrepresentation

or . . . conceal, suppress, or omit any material fact in connection with the sale or advertisement of

any merchandise, regardless of whether any person has in fact been mislead, deceived, or

damaged." S.D. Codified Laws § 37-24-6(1).  Further, "[a]ny person who claims to have been

adversely affected by any act or a practice declared to be unlawful by § 37-24-6 shall be

permitted to bring a civil action for the recovery of actual damages suffered as a result of such

act or practice." *Id.* § 37-24-31.  Because Defendants made misrepresentations to the PTO and

FDA, which in turn allowed Defendants to manufacture and market DDAVP to consumers on

the premise that the patent underlying DDVAP was legally obtained, Plaintiffs were "adversely

affected" by the fraud committed by Defendants within the meaning of the SDDTPA when they

relied on such representations and paid supra-competitive prices for the drug. *Cf. Brookings*

*Mun. Utils., Inc. v. Amoco Chem. Co.*, 103 F. Supp. 2d 1169, 1178 (D.S.D. 2000) ("Defendants cannot escape liability to plaintiffs for their alleged misrepresentations simply because they did not make any statements directly to plaintiffs. Defendants may be liable to plaintiffs, even if plaintiffs only received misrepresentations through [a third party]."). Accordingly, for reasons similar to those already stated, Defendants' Motion to Dismiss Plaintiffs' SDDTPA claims is denied.

### 9.    <u>Tennessee</u>

Defendants argue that only individual consumers may raise claims under the Tennessee Consumer Protection Act (the "TCPA"), Tenn. Code Ann. §§ 47-18-101 to -130, and that such claims cannot be raised in the context of a class action lawsuit. (Ds' Mem. 22). I agree. The TCPA states:

> Any person who suffers an ascertainable loss of money or property, real, personal, or mixed, or any other article, commodity, or thing of value wherever situated, as a result of the use or employment by another person of an unfair or deceptive act or practice . . . declared to be unlawful by this part, *may bring an action individually* to recover actual damages.

Tenn. Code Ann. § 47-18-109(a)(1) (emphasis added). In *Walker v. Sunrise Pontiac-GMC Truck, Inc.*, 249 S.W.3d 301 (Tenn. 2008), the Tennessee Supreme Court determined, by looking at the plain meaning of the statute, that TCPA claims could not be raised in a class action case. *Id.* at 310 ("[T]he present statute allows the type of case in which an individual . . . brings an action on behalf of another individual. Class actions are still prohibited because they are not actions brought 'individually.'"); *accord Bearden v. Honeywell Int'l Inc.*, No. 09-CV-1035, 2010 WL 3239285, at *8-10 (M.D. Tenn. Aug. 16, 2010) ("Tennessee law is clear that a plaintiff may not bring a TCPA claim on behalf of a class"); *Chester v. State Farm Fire & Cas. Co.*, No. 06-CV-277, 2008 WL 4415596, at *4 (E.D. Tenn. Sept. 24, 2008) ("[T]he intent of Tennessee's

Supreme Court and legislature was to prohibit *all* class actions under the TCPA.") (emphasis in original).  Defendants' Motion to Dismiss the TCPA claims is granted.[15]

**b.   Mississippi, New Hampshire, and North Carolina Antitrust Laws**

Next Defendants argue that the Plaintiffs fail to allege intrastate activity in Mississippi, New Hampshire, and North Carolina, which Defendants contend is a required element under each state's antitrust statute.  (Ds' Mem. 21-22.)

**1.   Mississippi**

The Mississippi Antitrust Act (the "MAA"), Miss. Code. Ann. §§ 75-21-1 to -39, prohibits agreements to "restrain trade," "increase . . . the price of a commodity," or "hinder competition in the production, importation, . . . sale or purchase of a commodity," *id.* § 75-21-1(a), (b), (d).  Defendants argue that Mississippi's antitrust laws are limited to intrastate conduct and the Plaintiffs' failure to allege state-specific activity is reason to dismiss their MAA claims, (Ds' Mem. 21), but case law does not support Defendants' contention.  A violation of the MAA "must have as one of its objects a monopoly in the intrastate trade . . . to be accomplished in part at least by transactions which are also wholly intrastate," *Standard Oil Co. of Ky. v. State*, 65 So. 468, 471 (Miss. 1914), *overruled on other grounds by Mladinich v. Kohn*, 164 So. 2d 785 (Miss. 1964), but once a foreign good is "incorporated into the general mass of property in [Mississippi], [it] thereby fall[s] within the compass of the Mississippi antitrust statute," *In re Intel Corp. Microprocessor Antitrust Litig.*, 496 F. Supp. 2d 404, 413 (D. Del. 2007) (internal quotation marks omitted); *see New Motor Vehicles*, 350 F. Supp. 2d at 171 (where car companies allegedly conspired to prevent less expensive Canadian cars from entering American market, fact that cars entered Mississippi and were sold there at higher price due to lack of competition was

---

[15] Because I find that Plaintiffs cannot raise TCPA claims within the context of a class action lawsuit, I need not reach Defendants' other argument that the TCPA does not apply to antitrust claims. (Ds' Mem. 20.)

sufficient to state claim under MAA); *Hood ex rel. State v. BASF Corp.*, No. 56863, 2006 WL 308378, at *5 (Miss. Ch. Jan. 17, 2006) (under rationale of *Standard Oil*, once defendant brought its vitamins into Mississippi, the goods' final destination, vitamins were subject to jurisdiction of Mississippi laws).  Therefore, as long as "some of the defendant's conduct offensive to the antitrust statute [is] performed wholly intrastate," the MAA will apply.  *In re Processed Egg Prods. Antitrust Litig.*, No. 08-MD-2002, 2012 WL 935669, at *13 (E.D. Pa. Mar. 20, 2012) (alteration and internal quotation marks omitted).

Here, Plaintiffs allege that the Plaintiffs who resided in Mississippi and purchased DDAVP there were forced to pay higher prices for the drug due to the Defendants' fraudulent and anticompetitive behavior.  Even though that conduct did not occur exclusively within Mississippi, the statute only requires that the product be "incorporated into the general mass of property in the state," *Intel Corp.*, 496 F. Supp. 2d at 413, and that some activity – "sales, purchases, or other activities in trade or commerce . . . took place in Mississippi and [we]re . . . related to [D]efendants' allegedly unlawful conduct," *California v. Infineon Techs. AG*, 531 F. Supp. 2d 1124, 1158 (N.D. Cal. 2007).  Accordingly, purchases of DDAVP in Mississippi plausibly satisfy the requirement under the MAA that some conduct occur in that state, and Defendants' Motion to Dismiss Plaintiffs' MAA claims is denied.

### 2.   New Hampshire

The New Hampshire Consumer Protection Act (the "NHCPA"), N.H. Rev. Stat. Ann. §§ 358-A:1 to -:13, states that it is "unlawful for any person to use any unfair method of competition or any unfair or deceptive act or practice in the conduct of any trade or commerce within this state." *Id.* § 358-A:2.  Section 358-A:1 defines "'[t]rade' and 'commerce' [to] include . . . any trade or commerce directly or indirectly affecting the people of this state." *Id.* § 358-A:1(II).

47

The New Hampshire legislature intended for the NHCPA to have a "broad sweep," and thus any "conduct which was part of trade or commerce that had direct or indirect effects on the people of [New Hampshire]" satisfies the statute. *LaChance v. U.S. Smokeless Tobacco Co.*, 931 A.2d 571, 578 (N.H. 2007) (indirect purchasers may bring suit if conduct directly or indirectly affects them). For example, the *Chocolate Confectionary* court held that a defendants' injection of price-fixed chocolates into the New Hampshire market satisfied the statutory requirement, and thus that indirect purchasers stated a claim under the NHCPA. 749 F. Supp. 2d at 234-35.

Here, too, Plaintiffs state a claim under the NHCPA because they allege that the putative Plaintiffs located in New Hampshire had to pay higher prices for DDAVP because of Defendants' alleged deception. Because New Hampshire commerce and citizens of the state were affected by Defendants' allegedly deceptive conduct, Defendants' Motion to Dismiss the NHCPA claims is denied.

### 3.   North Carolina

Defendants argue that North Carolina's Unfair and Deceptive Trade Practices Act (the "NCUDTPA"), N.C. Gen. Stat. §§ 75-1 to -49, applies "only to 'trade or commerce in the state of North Carolina,'" (Ds' Mem. 22 (quoting N.C. Gen. Stat. § 75-2.1)), but the NCUDTPA explicitly states that "[i]t is unlawful for any person to monopolize . . . *any part of* trade or commerce in the State of North Carolina," N.C. Gen. Stat § 75-2.1 (emphasis added). Defendants' Motion to Dismiss these claims on the ground that the NCUDTPA does not reach goods brought into North Carolina for sale is therefore denied. *See Sheet Metal*, 737 F. Supp. 2d at 400 (where "[p]laintiffs . . . alleged that [defendant] engaged in business in North Carolina by producing a drug sold and promoted in that state and that [defendant] unlawfully maintained its monopoly in North Carolina," allegations were sufficient to state claim under NCUDTPA); *see*

48

*also Digital Music*, 812 F. Supp. 2d at 407-08 (complaint that alleged that Defendants

"'produced, licensed, distributed and/or sold' Internet Music in all of the listed states," including

North Carolina, sufficiently alleged intrastate conduct to survive motion to dismiss).

### 4.    Unjust Enrichment Claims

Next, Defendants move on several grounds to dismiss Plaintiffs' unjust enrichment

claims, which are brought under the laws of each of the fifty states and the District of Columbia,

(Compl. ¶ 148), arguing that unjust enrichment claims may not stand where they (1) conflict with

a state's limitation on indirect purchaser antitrust suits, (2) do not allege the direct provision of a

benefit from plaintiff to defendant, and/or (3) do not provide an independent basis for relief when

no other legal violation is alleged. (*See* Ds' Mem. 22-25.)

### a.    States that Follow *Illinois Brick*

Defendants first argue that some state laws preclude indirect purchaser unjust enrichment

claims based on the rule set forth in *Illinois Brick Co. v. Illinois*, 431 U.S. 720 (1977). (Ds'

Mem. 23.)  Plaintiffs argue, citing *King Drug Co. of Florence, Inc. v. Cephalon, Inc.*, 702 F.

Supp. 2d 514, 539-40 (E.D. Pa. 2010), that their unjust enrichment claims are viable regardless

of the applicable state antitrust laws. (Ps' Mem. 34.)

In *Illinois Brick*, the Supreme Court held that only direct purchasers could sue for unjust

benefits gained by a defendant manufacturer through anticompetitive conduct that violated

federal antitrust laws. *See* 431 U.S. at 728-29 (precluding indirect purchaser recovery on basis

that only an "overcharged direct purchaser, and not others in the chain of manufacture or

distribution" is "the party 'injured in his business or property' within the meaning of [Section 4

of the Sherman Act]").  Subsequently, certain states have adopted *Illinois Brick* to preclude

indirect purchaser recovery under state antitrust and consumer protection laws, and courts have

held that "where the applicable state law bars antitrust actions for damages by indirect purchasers

49

. . . a plaintiff cannot circumvent the statutory framework by recasting an antitrust claim as one

for unjust enrichment." *K-Dur*, 2008 WL 2660780, at *5; *accord Flonase*, 692 F. Supp. 2d at

542 ("Allowing indirect purchasers to recover and recoup a benefit from the defendant under an

unjust enrichment theory would circumvent the policy choice of *Illinois Brick*."); *see Digital

Music*, 812 F. Supp. 2d at 413 (collecting cases discussing limitation on state-law unjust

enrichment claims after *Illinois Brick*). *But see G-Fees*, 584 F. Supp. 2d at 46 ("No reason or

logic supports a conclusion that a state's adherence to the rule of *Illinois Brick* dispossesses a

person not only of a statutory legal remedy for an antitrust violation, but also dispossesses the

same person of his right to pursue a common law equitable remedy.").

 Although the *King Drug* decision that Plaintiffs cite on this issue is not without force, this

Court finds more persuasive Chief Judge Preska's well-reasoned *Digital Music* opinion – and

similar decisions – that determined that indirect purchaser plaintiffs "may not recover restitution

in states that follow the rules of *Illinois Brick*," and that therefore states that have "not expressly

passed *Illinois Brick* repealer legislation or interpreted [their] law in such a way as to override

the rule of *Illinois Brick* [are] presumed to have decided to follow federal law, including the

*Illinois Brick* limitation on indirect purchaser claims." *Digital Music*, 812 F. Supp. 2d at 413;

*see, e.g.*, *Sheet Metal*, 737 F. Supp. 2d at 446-47 (dismissing unjust enrichment claim brought

under Texas law because Texas state court would not allow end-payor plaintiffs to file claims

under state antitrust or consumer protection laws); *K-Dur*, 2008 WL 2660780, at *5 (finding

persuasive on summary judgment "cases holding that where the applicable state law bars

antitrust actions for damages by indirect purchasers, or simply does not recognize a private cause

of action for antitrust violations, a plaintiff cannot circumvent the statutory framework by

recasting an antitrust claim as one for unjust enrichment"); *In re Terazosin Hydrochloride*

*Antitrust Litig.*, 160 F. Supp. 2d 1365, 1380 (S.D. Fla. 2001) ("State legislatures and courts that adopted the *Illinois Brick* rule against indirect purchaser antitrust suits did not intend to allow an end run around the policies allowing only direct purchasers to recover.") (internal quotation marks omitted).

Defendants contend that Alaska, Colorado, Connecticut, Delaware, Indiana, Kentucky, Louisiana, Maryland, Missouri, New Jersey, Ohio, Oklahoma, Oregon, Pennsylvania, Rhode Island, South Carolina, and Texas follow *Illinois Brick*. (*See* Ds' Mem. at 23; Ds' Reply Mem. 10 & n.7.) Although Defendants (perhaps because of the Court's page limitations) do not cite cases or statutes from those states to support this assertion, Plaintiffs do not dispute that these jurisdictions follow *Illinois Brick*. Therefore, Defendants' Motion to Dismiss Plaintiffs' unjust enrichment claims under the laws of Alaska, Colorado, Connecticut, Delaware, Indiana, Kentucky, Louisiana, Maryland, Missouri, New Jersey, Ohio, Oklahoma, Oregon, Pennsylvania, Rhode Island, South Carolina, and Texas is granted.

**b.    Direct Benefit from Plaintiffs to Defendants**

Next, Defendants argue that for Plaintiffs to successfully plead unjust enrichment claims under Florida, Idaho, New York, and North Dakota law, they must allege that Defendants received a direct benefit from Plaintiffs, and they cannot do so because Plaintiffs did not purchase DDAVP directly from Defendants. (Ds' Mem. 23-24; Ds' Reply Mem. 10.) Plaintiffs argue that (1) the laws of these states do not require a direct benefit, and (2) alternatively, Plaintiffs have alleged that they "conferred a benefit on Defendants by purchasing DDAVP at inflated prices[,] . . . . allegations [that] are sufficient to show that a benefit was bestowed on Defendants, and that the Defendants were therefore unjustly enriched at Plaintiffs' expense." (Ps' Mem. 34-35.)

On this issue, courts have disparately applied Florida law, *compare, e.g., Processed Egg Prods.*, 2012 WL 935669, at *45 (analyzing Florida law and determining that it "does not appear to require the conferral of a direct benefit exclusively," but rather "'that *some* benefit must *flow* to the party sought to be charged'") (emphasis in original) (quoting *Coffee Pot Plaza P'ship v. Arrow Air Conditioning & Refrigeration, Inc.*, 412 So. 2d 883, 884 (Fla. Dist. Ct. App. 1982)), *Romano v. Motorola, Inc.*, No. 07-CV-60517, 2007 WL 4199781, at *2 (S.D. Fla. Nov. 26, 2007) ("Defendant is correct in stating that Florida law does not support a cause of action for unjust enrichment unless the plaintiff can allege that he conferred a direct benefit on the defendant. However, . . . [w]hile the phone is ultimately sold through the retailer, Motorola is directly benefitted through profits earned from the sale of the phone. Therefore, while there was no direct *contact* between the manufacturer Motorola and Plaintiff, by purchasing the Razr phone, Plaintiff directly conferred a benefit on Motorola in the form of payment for the phone.") (emphasis in original) (internal citations and quotation marks omitted), *and Merkle v. Health Options, Inc.,* 940 So. 2d 1190, 1199 (Fla. Dist. Ct. App. 2006) (concluding that emergency medical service provider-plaintiff could plead an unjust enrichment claim against HMO-defendants where plaintiff's treatment of HMOs' subscribers conferred requisite benefit on defendants), *with Flonase*, 692 F. Supp. 2d at 544 (dismissing indirect purchasers' Florida unjust enrichment claim for failure to plead direct benefit upon defendant), and New York law, *compare Kaye v. Grossman*, 202 F.3d 611, 616 (2d Cir. 2000) (to support unjust enrichment claim, "[plaintiff] must demonstrate that [defendant] received *some benefit*" from Plaintiff's conduct with third party, although under facts of case, plaintiff proffered no evidence that defendant actually received money from third party) (emphasis added), *and Waldman v. New Chapter, Inc.*, 714 F. Supp. 2d 398, 403-04 (E.D.N.Y. 2010) (denying motion to dismiss

52

plaintiff-consumer's New York unjust enrichment claim against defendant-manufacturer because "New York law does not require an unjust enrichment plaintiff to plead 'direct dealing,' or an 'actual, substantive relationship' with the defendant"), *with Mandarin Trading Ltd. v. Wildenstein*, 16 N.Y.3d 173, 182 (2011) (although privity is not required, unjust enrichment claims fail where there is no indication of any relationship, or even "an awareness by [defendant] of [plaintiff]'s existence").

Under this set of facts, at this stage of the case, I agree with Plaintiffs – that is, that despite not having direct dealings (contractual or otherwise) with Defendants, Plaintiffs plausibly conferred some benefit on Defendants, albeit indirectly, by purchasing DDAVP at elevated prices, and Defendants profited from the individual demand of the DDAVP consumers, the ultimate victims of Defendants' unlawful conduct. Therefore, Defendants' Motion to Dismiss Plaintiffs' Florida and New York unjust enrichment claims is denied. *See In re Cardizem CD Antitrust Litig.*, 105 F. Supp. 2d 618, 668-71 (E.D. Mich. 2000) (plaintiffs stated unjust enrichment claim under various state laws, including New York, where "they conferred a benefit, in the form of overpayments and increased profits, on Defendants, that Defendants accepted that benefit[,] and that it would be unjust under the alleged circumstances for Defendants to retain that benefit").

Under Idaho law, "[t]he elements of unjust enrichment are that (1) a benefit is conferred on the defendant by the plaintiff; (2) the defendant appreciates the benefit; and (3) it would be inequitable for the defendant to accept the benefit without payment of the value of the benefit." *Harris, Inc. v. Foxhollow Constr. & Trucking, Inc.*, 264 P.3d 400, 410 (Idaho 2011) (internal quotation marks omitted); *accord Ross v. Ross*, 178 P.3d 639, 644 (Idaho Ct. App. 2007); *see Beco Constr. Co. v. Bannock Paving Co.*, 797 P.2d 863, 867 (Idaho 1990) (finding no unjust

enrichment where plaintiff "conferred no direct or indirect benefit on" defendant; "This court continues to require for an unjust enrichment recovery that the plaintiff confer some benefit on the defendant which would be unjust for the defendant to retain."). Defendants cite to *Sheet Metal Workers*, 737 F. Supp. 2d at 433 n.26, where the court there noted in *dictum* that had it not dismissed plaintiffs unjust enrichment claims on other grounds, it would have followed *Hayden Lake Fire Prot. Dist v. Alcorn*, 111 P.3d 73 (Idaho 2005), *overruled on other grounds by Farber v. Idaho State Ins. Fund*, 272 P.3d 467 (Idaho 2012), and dismissed them for failure to allege a direct benefit. Although there is limited case law interpreting Idaho unjust enrichment law, at least one court has explicitly stated that a plaintiff may not assert a claim for unjust enrichment under Idaho law unless he has conferred a direct benefit on the defendant. *See Powers v. Lycoming Engines*, 245 F.R.D. 226, 232 & n.19 (E.D. Pa. 2007); *see also In re ConAgra Peanut Butter Prods. Liab. Litig.*, No. 07-MD-1845, 2008 WL 2132233, at *2-3 (N.D. Ga. May 21, 2008) (discussing benefit that plaintiff must plead under various state unjust enrichment laws, and stating that "there is solid support for the Defendant's interpretation of a direct benefit in a few states. Nonetheless, it is clear that the benefit is sufficiently direct in this case for the majority of jurisdictions. This is especially true considering that the Defendant markets its product directly to consumers; though it sells its product through retailers, it directly profits from the individual demand of consumers.") (internal citation omitted). Here neither direct benefit nor direct marketing is alleged. Accordingly, Defendants' Motion to Dismiss the Idaho unjust enrichment claims is granted.

Under North Dakota law, to state a claim for unjust enrichment, a plaintiff must set forth facts demonstrating "(1) an enrichment; (2) an impoverishment; (3) a connection between the enrichment and the impoverishment; (4) absence of a justification for the enrichment and

impoverishment; and (5) an absence of a remedy provided by law." *Erickson v. Brown*, 813

N.W.2d 531, 538 (N.D. 2012) (internal quotation marks omitted). The North Dakota Supreme

Court has explained that a plaintiff can state an unjust enrichment claim under North Dakota law

when one party "has, without justification, obtained a benefit at the direct expense of the

complainant, who then has no legal means of retrieving it. The essential element . . . is the

receipt of a benefit by the defendant from the plaintiff which would be inequitable to retain

without paying for its value." *Apache Corp. v. MDU Res. Grp., Inc.*, 603 N.W.2d 891, 895

(N.D. 1999) (alteration, internal citation, and internal quotation marks omitted). Courts

interpreting North Dakota unjust enrichment law have focused on the "direct expense" language

in *Apache* in holding that indirect purchasers cannot sustain a claim for unjust enrichment. *See,*

*e.g.*, *In re TFT-LCD (Flat Panel) Antitrust Litig.*, 599 F. Supp. 2d 1179, 1190-91 (N.D. Cal.

2009) ("Plaintiffs distinguish *Apache* on the ground that there the plaintiff had not in fact

conferred any benefit on the defendant, whereas here plaintiffs do allege that they have conferred

a benefit on defendants. Although this factual distinction is correct, the broader language of

*Apache* suggests that a 'direct benefit' is required under North Dakota law."); *Thompson v.*

*Bayer Corp.*, No. 07-CV-17, 2009 WL 362982, at *5 (E.D. Ark. Feb. 12, 2009) (distinguishing

Arkansas unjust enrichment law where enrichment "need not come *directly* from the plaintiff,"

from North Dakota law, which "appears to apply only if another has, without justification,

obtained a benefit at the *direct expense* of the plaintiff.") (emphasis in original) (alteration and

internal quotation marks omitted); *In re Relafen Antitrust Litig.*, 225 F.R.D. 14, 28 (D. Mass.

2004) (finding North Dakota "precedent casts doubt on the end payors' unjust enrichment

claims" and thus because "the benefits that [defendant drug manufacturer] received were

obtained most directly from wholesalers, who, in turn, obtained benefits from end payors,"

plaintiffs did not state an unjust enrichment claim under North Dakota law); *see also Zuger v. N.D. Ins. Guar. Ass'n*, 494 N.W.2d 135, 139 (N.D. 1992) ("One factor in determining whether a party who has benefited from an agreement between others has been unjustly enriched is whether the benefiting party has participated in the transaction through which the benefit was obtained."). I am persuaded that Plaintiffs have not and cannot plead a direct benefit of the kind that North Dakota law requires – in other words, something akin to an arms-length transaction between the Indirect Purchaser Plaintiffs and Defendants is required to state a claim – and thus Defendants' Motion to Dismiss the North Dakota unjust enrichment claims is granted.

### c.   **Autonomous Enrichment Claims**

Finally, Defendants argue that that "courts have refused to permit state 'unjust enrichment' claims to proceed when there is no other state law basis for the relief sought by the plaintiff," and thus "have dismissed 'unjust enrichment' claims in conjunction with their dismissal of plaintiffs' state antitrust or consumer protection claims." (Ds' Mem. 24; *see* Ds' Reply Mem. 9 ("[I]f no claim in this case arises under a state's consumer or trade statute, unjust enrichment law does not magically create a cause of action out of thin air.").) Plaintiffs argue that indirect purchasers may bring independent unjust enrichment claims regardless of whether they are able to pursue state antitrust or consumer protection law claims. (Ps' Mem. 35.) Because the only state consumer protection law claims that I have dismissed are those under the TCPA, I analyze only whether Plaintiffs may bring an autonomous unjust enrichment claim[16] under Tennessee law.

---

[16] Unjust enrichment claims generally take two forms: (1) "parasitic" – in other words, "[w]here the unjust enrichment is based upon a predicate wrong, such as a tort, breach of contract or other wrongful conduct such as an antitrust violation," *Flonase*, 692 F. Supp. 2d at 542 n.13, and (2) "autonomous" or "freestanding," meaning that the "unjust enrichment alone . . . serve[s] as [an] independent ground[] for restitution in the absence of mistake, wrongdoing, or breach of contract," *New Motor Vehicles*, 350 F. Supp. 2d at 208 (internal quotation marks omitted). "Autonomous claims in an area regulated by an independent body of law are more problematic than parasitic claims because the premise for such a claim must be that, even if the defendants' conduct is blameless under the substantive

Some courts analyzing this issue have held that allowing plaintiffs to recover on a claim of autonomous restitution "would undermine state legislative policies and an entire body of substantive law," *Flonase*, 692 F. Supp. 2d at 543 n.13, because allowing restitution where a plaintiff could not otherwise recover under state law "would subvert state legislative attempts to limit antitrust liability for defendants," *Sheet Metal*, 737 F. Supp. 2d at 426 (dismissing indirect purchaser plaintiffs' unjust enrichment claims in states where plaintiffs had no remedy under state antitrust or consumer protection law). Plaintiffs cite *Cardizem CD*, 105 F. Supp. 2d 618, which stated that "courts often award equitable remedies under common law claims for unjust enrichment in circumstances where claims based upon contract or other state law violations prove unsuccessful," and allowed plaintiffs' unjust enrichment claims there to survive a motion to dismiss because they depended on allegations and proof different from that which a plaintiff must plead to state an antitrust claim – namely, a defendant's unjust retention of a benefit conferred on the defendant by the plaintiff. *Id.* at 669-70 (collecting state cases).

Courts interpreting Tennessee law have disagreed as to whether plaintiffs may bring freestanding unjust enrichment claims. Some courts have allowed autonomous unjust enrichment claims to move forward because their "viability . . . does not hinge upon the success of the state statutory antitrust claims," a finding that one court determined was "buttress[ed]" by the fact that – in that court's opinion –the Tennessee Supreme Court expressly permitted indirect purchasers to bring independent unjust enrichment claims. *D.R. Ward Constr. Co. v. Rohm & Haas Co.*, 470 F. Supp. 2d 485, 506-07 (E.D. Pa. 2006) (citing *Freeman Indus., LLC v. Eastman Chem. Co.*, 172 S.W.3d 512, 524-26 (Tenn. 2005)).[17] Other courts have stated that there is no

---

requirements of federal and state antitrust statutes and state consumer protection statutes, the plaintiffs nevertheless can still obtain restitution." *Digital Music*, 812 F. Supp. 2d at 411-12 (internal quotation marks omitted).

[17] In my view, the *Freeman* court did not expressly reach the issue of whether indirect purchasers may bring autonomous unjust enrichment claims. Rather, after dismissing the Tennessee Trade Practices Act ("TTPA") claim,

"convincing authority establishing that Tennessee courts recognize an autonomous unjust enrichment claim." *Sheet Metal*, 737 F. Supp. 2d at 446. Undoubtedly because briefing on the instant Motion required the parties to analyze many complex issues within page limits, neither party supplied the Court with authority as to whether Plaintiffs can or cannot maintain an autonomous unjust enrichment claim under Tennessee law. Accordingly, Defendants' Motion to Dismiss Plaintiffs' unjust enrichment claims under Tennessee law is denied without prejudice. Should Defendants later seek judicial resolution of this issue, they should support their argument with citations to governing Tennessee law.

---

*see* Tenn. Code. Ann. §§ 47-25-101 to -115, the court went on to discuss why the trial court had erred in denying defendants' motion for summary judgment on the plaintiff's unjust enrichment claim where the plaintiff had failed to establish a disputed issue of material fact as to the exhaustion-of-remedies element of that claim. That the Court discussed the issue, rather than summarily concluding that the unjust enrichment claim failed because the TTPA claim failed, could suggest that a freestanding unjust enrichment claim is allowed under Tennessee law, but the *Freeman* court was not explicit on the point.

## IV.   **CONCLUSION**

For the foregoing reasons, Defendants' Motion to Dismiss is GRANTED IN PART and DENIED IN PART, and Plaintiffs' Request for Judicial Notice is DENIED.  The Court dismisses Plaintiffs claims for (1) an injunction under Section 16 of the Clayton Act, (2) violations of the TCPA, and (3) unjust enrichment under Idaho and North Dakota law and under the laws of the states that follow *Illinois Brick* (Alaska, Colorado, Connecticut, Delaware, Indiana, Kentucky, Louisiana, Maryland, Missouri, New Jersey, Ohio, Oklahoma, Oregon, Pennsylvania, Rhode Island, South Carolina, and Texas).  The Clerk of Court is respectfully directed to terminate the pending motions.  (Docs. 103, 109.)  The parties are to appear for a status conference on October 31, 2012 at 3:00 p.m.

**SO ORDERED.**

DATED:          White Plains, New York
                October 16, 2012

Cathy Seibel, U.S.D.J.