UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| IN RE DDAVP INDIRECT PURCHASER ANTITRUST LITIGATION | ) ) ) | No. 05 Civ. 2237 (CS) |
| | ) ) | Hon. Cathy Seibel, U.S.D.J. |
| THIS DOCUMENT RELATES TO: ALL ACTIONS | ) ) ) ) | |

**AFFIDAVIT OF KEVIN B. LOVE IN SUPPORT OF INDIRECT PURCHASER
PLAINTIFFS' MOTION FOR FINAL APPROVAL OF SETTLEMENT AND INDIRECT
PURCHASER PLAINTIFFS' MOTION FOR AN AWARD OF ATTORNEYS' FEES,
REIMBURSEMENT OF EXPENSES AND PAYMENT OF INCENTIVE AWARDS**

1.       I am a partner in the law firm of Criden & Love, P.A. ("C&L").  C&L represents

Vista Healthplan, Inc., k/n/a Coventry Health Care of Florida, Inc., in this action, and was appointed

Co-Lead Counsel for the Indirect Purchaser Class.[1]  I make this Affidavit on personal knowledge,

and in support of Indirect Purchaser Plaintiffs' Motion for Final Approval of the Settlement and

Indirect Purchaser Plaintiffs' Motion for an Award of Attorneys' Fees, Reimbursement of Expenses

and Payment of Incentive Awards.

**I. Introduction**

2.       This Action began in 2005.  Indirect Purchaser Plaintiffs ("Plaintiffs") have

prosecuted the Action for eight years.  The case looked very promising at the start.  As the case wore

on, however, Lead Counsel became aware of facts and issues that led them to believe that a

settlement would be in the best interests of the Class.  In light of that conclusion, Lead Counsel

began settlement discussions in 2011.  These 2011 discussions ended soon after they started and did

not resume until September 2012.  In October 2012, Lead Counsel finally reached a deal with Ferring

---

[1] In addition to C&L, the Court appointed Cafferty Clobes Meriwether & Sprengel, LLP, Spector Roseman
Kodroff & Willis, P.C. and Kessler Topaz Meltzer & Check, LLP as Co-Lead Counsel.

for $3,950,000. In December 2012, Lead Counsel settled with Aventis for $800,000. The precise

terms of the $4,750,000 Settlement were not memorialized until February 26, 2013. *See* Settlement

Agreement, attached hereto as Exhibit "A." Pursuant to the Court's Preliminary Approval Order,

the Notice Administrator and Class Administrator caused Notice to be sent and published to the

Class. *See* Declaration of Eric Miller of A.B. Data., attached hereto as Exhibit "B."

   3. As explained below, I and the other Lead Counsel believe that the Settlement is fair,

reasonable and adequate, and therefore we strongly recommend that the Court approve it.

## II. The Prosecution of the Litigation

### *Barr's Patent Case*

   4. Lead Counsel became aware of Defendants' alleged conduct after this Court (Brieant,

J.) issued an order finding that Defendants engaged in inequitable conduct. Specifically, on a motion

for summary judgment, the Court held that, during the prosecution of the '398 patent, Dr. Vilhardt,

one of the inventors of the '398 patent, submitted several expert declarations to the PTO, but failed

to disclose their past relationships with Ferring.

   5. The '398 patent claimed an orally effective form (tablet) of desmopressin ("DDAVP")

designed to be absorbed in the gastrointestinal tract. Up to that point, desmopressin had to be

inhaled, injected or ingested sublingually (under the tongue). The PTO initially rejected Ferring's

application for the '398 patent because it believed that two earlier references suggested that oral

delivery, and subsequent absorption in the gastrointestinal track, was possible. The PTO

recommended that Dr. Vilhardt obtain evidence to suggest otherwise from "non-inventors." Dr.

Vilhardt ultimately submitted five more declarations, four of which the Court found failed to disclose

that the declarants had consulted with Ferring in the past. The Court held that "it must have been

clear" to Dr. Vilhardt that when the PTO asked for "non-inventor" declarations, the PTO actually meant that it wanted declarations from experts who had never been associated with Ferring in the past.

6.     Using a balancing test, the Court held that Dr. Vilhardt intended to deceive the PTO and that there was a substantial likelihood that a reasonable examiner would consider the "consulting contacts" important in deciding whether to allow the patent.  Lastly, the Court held that it was irrelevant whether the declarants' opinions were in fact objective and correct.  Defendants appealed to the Federal Circuit.

### *Citizen Petition*

7.     On February 2, 2004, while the *Barr* Action was entering its summary judgment phase, Ferring (in consultation with Aventis) filed a citizen petition with the FDA, suggesting that Barr be required to conduct additional tests to establish that its product was bioequivalent to DDAVP and/or to establish that Barr's generic tablet had the same safety and efficacy profile as DDAVP when used in children (one of the intended populations for the drug). After the district court's summary judgment opinion in the *Barr* Action, Barr submitted a response to Ferring citizen's petition.  Barr's response noted that Aventis had sponsored research that was unfavorable to the positions advanced by Ferring in its citizen petition. The FDA denied the citizen petition, and in so doing, specifically noted Ferring's failure to include this unfavorable information from the Aventis research in its citizen petition.  Barr came to market with its generic DDAVP on July 15, 2005.

### *Our Initial Complaint*

8.     In February 2005, after this Court's ruling, and after each law firm researched the facts and law surrounding the case, several purchaser groups filed complaints, including the Indirect

-3-

Purchasers.

### *Discovery*

9.      In April 2005, the Court directed Defendants to produce all documents and materials

from the *Barr* Action, as well as materials from a second patent infringement action Ferring had

commenced against Teva Pharmaceuticals.  In compliance with this Order, Defendants produced

pleadings, hearing transcripts and discovery materials (including deposition transcripts) from the

patent cases. Defendants also produced transactional data reflecting sales of DDAVP tablets.

Plaintiffs also subpoenaed and obtained documents from the files of third parties, including Barr and

Teva.  Plaintiffs reviewed all of these materials.

### *Appeal of Barr's Patent Case*

10.      In February 2006, the Federal Circuit, in a 2-1 opinion, affirmed this Court's

judgment of inequitable conduct.  In response to Defendants' argument that summary judgment was

improper because they could have submitted evidence concerning, among other things, Dr.

Vilhardt's lack of knowledge of the patent application process (bearing on his alleged intent to

deceive), the court held that such an argument was speculative.  Judge Newman issued a dissent that

is discussed below.

### *Defendants' First Motion to Dismiss*

11.      Plaintiffs filed their Consolidated Amended Complaint on April 5, 2006.  Defendants

moved to dismiss the Direct and Indirect Purchaser Plaintiffs' Complaints on the basis that they both

lacked antitrust standing to sue for Defendants' alleged fraud on the PTO *(Walker Process* fraud).

Defendants also argued that the claims were not sufficiently pleaded, and that wrongdoing by

Aventis was not sufficiently alleged.  On November 2, 2006, the Court granted the motion to

dismiss, holding that Plaintiffs had not pleaded sufficient facts to sustain a monopolization claim, that both Plaintiff groups lacked antitrust standing to assert a *Walker Process* theory, and that Plaintiffs failed to allege sufficient facts regarding Aventis to satisfy the requirements of Rule 9(b).

### Appeal of the Dismissal

12.     Both the Direct and Indirect Plaintiffs timely appealed. The Indirect Purchaser Plaintiffs entered into a series of stipulations that placed their appeal in suspense while the Direct Purchaser Plaintiffs briefed their appeal. The suspense was without prejudice to reactivate the appeal after the Second Circuit issued its decision on the Direct Purchaser Plaintiffs' appeal.

13.     On October 16, 2009, the Second Circuit reversed and remanded the case as to the Direct Purchaser Plaintiffs concluding that: (1) the Direct Purchaser Plaintiffs had standing to assert a *Walker Process* claim; (2) Plaintiffs' allegations were all adequately pleaded; and (3) Plaintiffs had pleaded sufficient facts concerning Aventis's wrongdoing.

14.     On July 20, 2010, after the United States Supreme Court denied Defendants' writ of certiorari in the Direct Purchaser Plaintiffs' appeal, the Indirect Purchaser Plaintiffs reactivated their appeal. Defendants then filed a motion to transfer the appeal to the Federal Circuit. On November 4, 2010, the motion to transfer was denied. The parties subsequently filed a joint motion to remand to this Court. That motion was granted on March 31, 2011.

### Direct Purchaser Plaintiffs' Settlement

15.     On July 6, 2011, the Direct Purchaser Plaintiffs announced their $20.25 million settlement with the Defendants.

### Motion to Vacate Judgment

16.     The Indirect Purchaser Plaintiffs began settlement discussions with Defendants soon

after the Direct Purchaser Plaintiffs' settlement was announced, but those discussions ended in an impasse. Plaintiffs also requested that Defendants mediate, but Defendants turned down the offer. So Plaintiffs requested that the Court vacate the judgment in order that the case could proceed. On July 8, 2011, the Court vacated the judgment.

### Amended Complaint and Defendants' Second Motion to Dismiss

17.     On July 26, 2011, the Plaintiffs filed their Amended Consolidated Class Action Complaint. On November 9, 2011, the parties filed all of the briefing associated with Defendants' Second Motion to Dismiss. Defendants' primary argument was that all of Plaintiffs' state-law claims were preempted under federal law. On October 17, 2012, the Court entered an Order granting in part and denying in part Defendants' Joint Motion to Dismiss. While Plaintiffs' claims for federal injunctive relief and nationwide unjust enrichment were dismissed, most of Plaintiffs' state-law claims survived the motion.

### III. States' Settlement

18.     On January 13, 2012, several States entered into a settlement agreement with Defendants regarding the same allegations as were presented in this case. After conducting their own independent investigation of the allegations, the States decided not to file an action. Instead, they settled with Defendants for $3,450,000.

### IV. Indirect Purchaser Plaintiffs' Settlement

#### Negotiations

19.     Settlement negotiations between the Indirect Purchaser Plaintiffs and Defendants, which had stalled in late 2011, resumed in September 2012 while the motion to dismiss was pending. After the Court's ruling on the motion to dismiss in October 2012, Ferring settled for $3.95 million.

Plaintiffs then drafted and submitted a scheduling order to continue prosecution of the action against Aventis. In the meantime, settlement negotiations continued with Aventis. In December 2012, Aventis agreed to settle for $800,000. The final Settlement Agreement was executed on February 26, 2013.

20.     I personally led Plaintiffs' settlement negotiations with Defendants, which resulted in the $4.75 million Settlement.

21.     All settlement negotiations were strictly at arm's length, in good faith, and free of any collusion. Even after the parties agreed to the $4.75 million, it took several more months for the parties to agree on the precise language of the Settlement Agreement. Since the Notice went out, Class Counsel has not received any objections to the Settlement. The deadline to file objections, however, is not until November 22, 2013.

## V.  Reasons for the Settlement – Strengths and Weaknesses of the Case

22.     When Plaintiffs began this case in 2005, there were many reasons to think that they would win. Dr. Vilhardt had submitted declarations to the PTO from experts with past ties to Ferring when the PTO had asked for declarations from experts who were non-inventors. The trial judge had found inequitable conduct. The Federal Circuit affirmed, with Judge Newman dissenting. Eventually, Plaintiffs would overcome not one, but two motions to dismiss. And the Second Circuit would hold that Plaintiffs' allegations set forth a viable *Walker Process* claim, and that Direct Purchasers have standing to raise such a claim.

23.     Since the filing of the initial complaint, however, it has become necessary for Class Counsel to acknowledge certain weaknesses in the case. I discuss some of these issues in detail below.

### *Judge Brieant Never Held That Defendants Engaged In Fraud*

24.     Judge Brieant's holding that Defendants engaged in inequitable conduct was the impetus for the filing of this Action.  Yet, after that holding, Judge Brieant went out of his way several times, on the record, to point out that he <u>never</u> held that the Defendants' conduct amounted to fraud.

25.     First, in dismissing our case in 2006, Judge Brieant held that Defendants' "misconduct has not been shown to rise to the level of fraud, so as to lead to invalidity." D.E. 48 at 7.  After noting that "*Walker Process* fraud is a more serious offense than inequitable conduct" in that it requires "a clear intent to deceive the examiner [causing] the PTO to grant an invalid patent," he held that "the Court's findings in the prior litigation . . . do not arise to the *Walker Process* requirements of fraud and invalidity." *Id.* at 7-8.

26.     Judge Brieant concluded by stating that the Court "did <u>not</u> determine that fraud was perpetrated on the PTO, nor that but for the omissions found, the patent would not have issued.  Nor could it have done so on the complete record presented in *Ferring I*." *Id.* (e.s.).

27.     As Judge Brieant also observed, Judge Newman, in dissent, agreed with his assessment when she remarked that the record "does not indicate sufficient culpability to require a finding of intent to deceive." *Id.* at 8; *Ferring v. Barr*, 437 F.3d 1181, 1205 (Fed. Cir. 2006).  While the Second Circuit ultimately reversed Judge Brieant, it did not conduct an independent review of the record and find fraud; rather, it merely held that Plaintiffs' <u>allegations</u> of fraud were sufficient for Rule 9(b) purposes to survive a motion to dismiss.

28.     As time went by, Judge Brieant never wavered from his position.  For example, on March 1, 2007, at a hearing on a motion for fees brought by Barr, he held: "This Court never found

-8-

conduct rising to the level of fraud." Transcript at 31.   "This Court adheres to its finding in [the]

related case." *Id.* at 32.   "The lack of candor [relating to] the nondisclosure of potentially biased

relationships" is not the same thing as "the intentional nondisclosure of prior art directly bearing on

the patentability of the product.  And the lack of candor constituting inequitable conduct in this case

does not, in the opinion of this Court, render the case exceptional . . . ." *Id.* at 33.  It is therefore not

surprising that Barr chose not to bring a *Walker Process* claim against Defendants, even though it

is almost automatic to raise such a claim in these type of cases.

      29.     Judge Newman's dissent apparently troubled Judge Brieant after his initial ruling on

inequitable conduct.  As he put it, "Judge Newman's dissent in this case shows that the whole thing

wasn't totally free from doubt . . . [and] it does lead to the conclusion that the outcome of this case

was not free from doubt." Transcript at 32.

      30.     In her dissent, Judge Newman observed that there was no evidence that Dr. Vilhardt

actually intended to deceive the PTO.   In her view, Dr. Vilhardt complied with the PTO's request

for "non-inventor" declarations by presenting the PTO with declarations from distinguished

scientists who were, unquestionably, not listed as inventors on the '398 patent.  She also observed

that there was absolutely no evidence that any of the scientists presented a false opinion.  437 F.3d

at 1195-1205.

      31.     Although the fact that both Judge Brieant and Judge Newman believed that

Defendants did not commit fraud does not necessarily mean that Plaintiffs could not still convince

a jury otherwise, we would be remiss not to at least acknowledge that these two jurists did not find

any fraud.  Making it worse is the fact that it was Judge Brieant's original findings that precipitated

the filing of this Action in the first place.

***Defendants' Conduct Would No Longer Be Considered Inequitable Conduct***

32.     Not only did Judge Brieant <u>not</u> find that Defendants defrauded the PTO, but under current Federal Circuit law, Judge Brieant could no longer find that Defendants engaged in inequitable conduct.

33.     In *Therasense v. Becton Dickinson*, 649 F.3d 1276 (Fed. Cir. 2011), the Federal Circuit changed the test for inequitable conduct.  No longer can a court use a negligence or gross negligence standard for finding intent; no longer can a court use a sliding scale to find intent or materiality, where none exists; no longer can a court find intent to deceive if there are other reasonable inferences, unless intent to deceive is the most reasonable inference; and no longer can a court find inequitable conduct because a defendant did not offer a good-faith explanation unless the plaintiff first proves a threshold level of intent to deceive by clear and convincing evidence.

34.     In finding inequitable conduct, Judge Brieant: (1) concluded that Dr. Vilhardt <u>should have known</u> that the PTO's "non-inventor" declarations requirement actually meant "totally disinterested" declarations ("it must have been clear to Dr. Vilhardt . . ."); *Ferring*, 2005 WL 437981, at *8; *see also Ferring*, 437 F.3d at 1196, 1201; (2) balanced the "high materiality" against the low showing of intent in order to find intent; and (3) never analyzed any good-faith explanation for the omission.  It is thus highly unlikely that he would now find inequitable conduct if he were to review the evidence under the new *Therasense* standard, which is more akin to the more restrictive standard for finding *Walker Process* fraud.

35.     Perhaps most important, the *Therasense* Court held that to establish inequitable conduct, a plaintiff must show but-for materiality.  But Barr never alleged, let alone proved, that had Dr. Vilhardt disclosed the declarants' past contacts with Ferring the patent would not have issued.

On appeal before the Federal Circuit, Barr argued: "And it makes no difference for inequitable conduct whether the patent would have issued . . . ." Nor has discovery to date revealed that any of the declarants were lying.

36.     Presently, therefore, there is no evidence that Defendants could not have not fixed the "past associations" omission and that the patent would have still issued (*see* patentability issue below).

37.     While the issue in this case is *Walker Process* fraud and not inequitable conduct, Plaintiffs can't ignore the fact that it is unlikely that the alleged conduct would even meet the current (and arguably more lenient) standard of inequitable conduct under *Therasense*.

### Defendants Will Now Have the Opportunity to Submit Evidence of Dr. Vilhardt's Good Faith

38.     In affirming the inequitable conduct finding, the Federal Circuit, aside from using the old test for inequitable conduct, held that Defendants could not argue Dr. Vilhardt's good-faith intent because the issue was not preserved below. *Ferring v. Barr*, 437 F.3d 1181, 1190-93 (Fed. Cir. 2006) (deeming Defendants' good-faith arguments nothing but "speculation"). Judge Newman, in dissent, pointed out that Defendants did in fact submit such evidence, but that the evidence was simply ignored by the Court. In any event, she did not believe that Barr ever produced evidence of an intent to deceive to even trigger the need for a rebuttal from Defendants. *Id.* at 1203-04. Barr, for its part, argued that Defendants submitted no evidence whatsoever to rebut Barr's showing of intent, "thereby conceding that there were no factual disputes." Whether Defendants in fact submitted evidence or not in response to Barr's summary judgment motion is of no moment to this case because Defendants will now have the opportunity to submit evidence tending to show Dr. Vilhardt's good faith.

39.     Defendants' evidence regarding Dr. Vilhardt's lack of intent to deceive includes, but is not limited to, the fact that Dr. Vilhardt: (a) was a foreign scientist who had no previous experience with the PTO; (b) was not aware that when the PTO used the term "non-inventors," it actually meant "a scientist who is a complete stranger to Ferring"; and (c) chose the declarants simply because they all were scientists knowledgeable in the field.  And even assuming that Dr. Vilhardt knew that "non-inventors" meant "a scientist who had never associated with Ferring previously," there is no evidence that Dr. Vilhardt, submitting declarations four years later, understood that the PTO was still enforcing this "requirement."  Last, but not least, Dr. Vilhardt did in fact submit a declaration from an <u>independent</u> expert who testified on the same issues as the other declarants.

40.     Although Judge Brieant never considered any good-faith evidence, a jury in this case would hear it all, and might conclude that the omissions arose from simple negligence, dooming Plaintiffs' *Walker Process* claim.  Of course, a jury might discount the good-faith evidence, but Lead Counsel must recognize that neither Judge Brieant nor the Federal Circuit took into consideration such evidence when they held that Ferring engaged in inequitable conduct.

### *Plaintiffs Will Have to Prove Patentability*

41.     In this case, the Second Circuit held the following:

> For antitrust purposes, whether a patent could be issued matters more than who would possess it; if a patent could still have been issued to someone, its market power would still have been concentrated (properly) in one party. <u>As a result, *Walker Process* fraud must concern a material issue of patentability</u>; otherwise, a patent would have issued regardless of any fraud, and potential plaintiffs would have suffered the same monopoly effects (but legitimately).

*In re DDAVP*, 585 F.3d 677, 693 (2d Cir. 2009) (citations and quotations omitted) (e.s.).

42.     The Second Circuit then observed that Plaintiffs did <u>not</u> actually address patentability in their complaint.  Nonetheless, the court felt that the issue was <u>implicit</u> in Plaintiffs' allegations. *Id.*

43.     The court later concluded that "whether or not these declarations, if accompanied by full disclosure, would have resulted in an enforceable patent is <u>debatable</u>, but we think that, at the <u>pleading</u> stage, the fact of non-disclosure is sufficient to properly allege materiality." *Id.* (emphasis added).

44.     In reality, Plaintiffs <u>never</u> alleged that the '398 patent was invalid or not patentable. Likewise, Barr, in their case against Defendants, never argued that the patent was not patentable: "And it makes no difference for inequitable conduct whether the patent would have issued . . . ." Finally, discovery to date has not revealed any facts suggesting that the '398 patent was not patentable.  In fact, Dr. Vilhardt submitted a declaration from an "independent" expert who testified on the same issues as the other declarants.  It is therefore reasonable to assume that, had this case continued, Defendants would have argued that the omission could have easily been corrected and the '398 patent would still have issued.  While future discovery might uncover evidence to suggest otherwise, the fact remains that there is currently no evidence to indicate that had Defendants revealed the other declarants' associations (or had later submitted declarations from disinterested experts in addition to the one they has already submitted) the PTO would have found the '398 patent unpatentable for obviousness.

### Barr May Not Have Been Able to Come to Market Any Earlier

45.     To prove antitrust injury and damages in this case, Plaintiffs need to prove that Barr, but for Defendants' conduct, could have come to market sooner than July 15, 2005.  The longer the

delay, the more damages suffered by Plaintiffs and the Class.

46.      A review of Barr's ANDA regulatory file shows that Barr received FDA deficiency letters and submitted amendments through late 2004, even after Defendants filed their citizen petition. And Barr never received tentative approval of its ANDA. "Tentative approval" means that the ANDA provisionally satisfies the requirements for final approval, which the FDA is precluded from granting because of a regulatory stay. Demonstrating that a generic manufacturer could have come to market any earlier than it did is a significant obstacle in any case, but even more so when the FDA never granted tentative approval.

47.      Additional discovery from Barr has also shown that it is highly unlikely that Barr could have come to market much earlier than it did, severely limiting the amount of damages that could be recovered in this case. While it is possible that other evidence may have turned up before trial, the evidence currently indicates that Defendants' conduct did not delay Barr's entry into the market.

### *Preemption Under Federal Law*

48.      In their Second Motion to Dismiss, Defendants argued that Plaintiffs' state-law claims were preempted by federal law. Although Defendants lost the motion to dismiss, no appellate court has yet ruled directly on the issue, and several district courts have ruled the other way. *In re DDAVP*, 903 F. Supp. 2d 198, 214-221 (S.D.N.Y. 2012).

49.      Thus, even if Plaintiffs had won at trial, Defendants would surely have raised the preemption issue on appeal. While Plaintiffs believe they would have ultimately prevailed on this argument, the possibility remains that Plaintiffs could win at trial only to have the judgment overturned on appeal due to preemption.

### No Court Has Ever Held That Indirect Purchaser
### Plaintiffs Have Standing to Raise a Walker Process Claim

50.     Standing is yet another hurdle for Plaintiffs.  While the <u>Direct</u> Purchaser Plaintiffs

were granted standing by the Second Circuit, the court did not rule on whether the <u>Indirect</u> Purchaser

Plaintiffs have standing.

51.     We therefore believe that, had this case continued, Defendants would have argued

that the Second Circuit's opinion suggests <u>indirect</u> purchasers do not have standing to allege a

*Walker Process* claim.  For example, in analyzing the "potential for duplicative recovery" – the

fourth of the "efficient enforcer" factors – the Second Circuit noted that the Direct Purchaser

Plaintiffs were seeking "overcharges," in contrast to the "profits" that competitors may recover, and

that "the two . . . can be fairly apportioned in order to avoid duplicative recoveries." 585 F.3d at 689.

Of course, the Indirect Purchaser Plaintiffs also seek overcharges.  Thus, it is unclear how the Second

Circuit would reconcile the fact that both Plaintiff classes would be seeking to recover the same

overcharges.

52.     While several courts (other than the Second Circuit) have held <u>direct</u> purchaser

plaintiffs have standing in these types of cases, I am unaware of any court that has ever ruled that

<u>indirect</u> purchaser plaintiffs have standing to maintain a *Walker Process* claim.  Plaintiffs continue

to believe that they have standing to assert their claims in this action, but this is yet another issue that

could cause any judgment to disappear on appeal.

### The Events Alleged in the Complaint Took Place Twenty-Five Years Ago

53.     The '398 patent application was filed in 1985.  The '398 patent issued in 1991.  Thus,

the allegations of fraud on the PTO occurred between 1985 and 1991.  Because of the length of time

that has passed since the alleged unlawful conduct, one would reasonably expect that documents

have been lost and memories have faded, making an already difficult case even more challenging to win.  Furthermore, as the case goes into its eighth year, the chances of returning money to the Class Members become more and more difficult, if not impossible.

54.    The difficulty of proving this case is only compounded by the fact that Plaintiffs will need to prove their claims under the "clear and convincing evidence" standard.

### The States Settle for $3,450,000

55.    On January 13, 2012, several States entered into a settlement agreement with Defendants regarding the same allegations as were presented in this case.  After conducting their own independent investigation of the allegations, the States decided not to file an action.  Instead, they settled with Defendants for $3,450,000, less than the $4,750,000 the Defendants are paying the Indirect Purchaser Plaintiffs to settle this Action.

56.    The Direct Purchaser Plaintiffs settled for $20.25 million, an amount substantially less than they were looking for when they filed their case.

### Plaintiffs May Not Be Able to Prove Damages

57.    Even if Plaintiffs could prevail on liability, Plaintiffs may be unable to prove damages.  Leaving aside the issue of whether Barr could have come to market earlier than it did (see above), an expert is required to calculate damages.

58.    Plaintiffs retained an expert to calculate damages.  He has calculated these type of damages in many similar cases over the past twenty years using a common shift-back methodology.  The expert, however, was unable to calculate damages in this case using his usual methodology because the critical data for his calculations no longer exist.

59.    Thus, even assuming liability could be proven in this case, Plaintiffs would face the

-16-

prospect of using a novel methodology to calculate class-wide damages. While Plaintiffs believe that the expert's alternative method would survive a *Daubert* challenge, the possibility remains that Plaintiffs could win on liability but still lose the case because they cannot prove any damages.

## VI.     Plan of Allocation

60.     Joseph Lipofsky of Zwerling, Schachter & Zwerling, LLP was appointed as Third-Party Allocation Counsel and Joseph Meltzer of Kessler Topaz Meltzer & Check, LLP was appointed as Consumer Allocation Counsel. Mr. Meltzer, who is also a Co-Lead counsel and represents a consumer in this action, was omitted from all other damages and allocation decisions so he could devote himself solely to the interests of consumers in the allocation decision.

61.     Allocation counsel ultimately arrived at a reasonable allocation of the Settlement Fund – 68% to TPPs and 32% to Consumers. This type of process has been endorsed by several courts. *See, e.g., In re: Warfarin Sodium Antitrust Litig.*, 391 F.3d 516, 539 (3d Cir. 2004). The final allocation was included in the Notice to the Class, and the Proposed Plan of Allocation was posted on the website maintained by the Claims Administrator. At this point, Class Counsel has not received any objections to the Proposed Plan of Allocation. The deadline for objections, however is not until November 22, 2013.

## VII.    Class Counsel's Lodestar and Expenses

62.     The four Lead Counsel firms have expended more than 4,000 hours prosecuting this contingent matter over the past eight years, resulting in a lodestar in excess of $2,000,000.[2] These figures do not include any work on final approval papers or the time Lead Counsel will expend in

---

[2] If one includes the lodestar for all firms prosecuting this case, then Class Counsel has spent nearly 6,000 hours on this case, resulting in a total lodestar of more than $3,000,000.

-17-

administrating the Settlement.   Class Counsel has also incurred expenses in the amount of $103,946.14.  Fees and expenses incurred by the four Lead Counsel firms are set forth in their respective affidavits, attached hereto as Exhibits "C" through "F."[3]  At this point, Class Counsel has not received any objections to its request for fees and expenses.  As noted above, however, the deadline to object is not until November 22, 2013.

## VIII.   Class Representatives

63.    Each Class Representative has participated significantly in this litigation for the benefit of all Class Members.  In recognition of their time and effort expended for the benefit of the Class, Lead Counsel requests an incentive award of $5,000 for each TPP Class Representative and $2,000 for the Consumer Class Representative.

## IX.    Conclusion

64.    Based on the foregoing, Lead Counsel believes that the $4.75 million settlement is fair, reasonable and adequate, and therefore strongly recommends that the Court approve it.

**FURTHER AFFIANT SAYETH NAUGHT.**

OCT 24, 2013
**Dated**

KEVIN B. LOVE

---

[3]  I have personally reviewed each firm's back-up for their fees and expenses and can represent that the total lodestar and expense numbers noted herein represent the total amount of lodestar and expenses for Class Counsel. Should the Court wish to review the back-up materials for any firm's reported lodestar or expenses, it will be provided to the Court.

-18-